UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDREW LIVINGSTON,

Plaintiff,

v.

CITY OF NEW YORK, THE NEW YORK CITY
ADMINISTRATION FOR CHILDREN'S
SERVICES, CROSSROADS JUVENILE CENTER,
and JAMAL NEDDERMAN, *individually and in
his official capacity for the New York City
Administration for Children Services,*

Defendants.

19 Civ. 5209 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Andrew Livingston brings this action against his former

employers, the City of New York (the "City"), the New York City Administration

for Children's Services ("ACS"), and Crossroads Juvenile Center ("Crossroads"),

as well as Jamal Nedderman (together with the City, ACS, and Crossroads,

"Defendants"), a Director of Operations at ACS's Division for Youth and Family

Justice during the relevant period. Plaintiff claims that Defendants subjected

him to discrimination, a hostile work environment, retaliation, and constructive

discharge, all on account of his religious beliefs, in violation of Title VII of the

Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. §§ 2000e to 2000e-

17 ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290-

297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin.

Code §§ 8-101 to 8-131 (the "NYCHRL").[1] Plaintiff also claims that the City,

---

[1]     To clarify, Plaintiff does not bring Title VII claims against Nedderman, as Title VII does
not provide for individual liability. *See Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d

ACS, and Crossroads negligently hired, retained, and supervised their employees.  Defendants now move for summary judgment under Federal Rule of Civil Procedure 56.  For the reasons set forth in the remainder of this Opinion, the Court grants Defendants' motion in full.

## BACKGROUND[2]

### A.   Factual Background

#### 1.   The Parties and ACS's Absence Control Policy

Plaintiff self-identifies as an Orthodox Observant Jew who observes the Sabbath, and is thus unable to work from sundown on Friday nights to

---

Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998).  Plaintiff does bring discrimination, hostile work environment, and retaliation claims under the NYSHRL and the NYCHRL against Nedderman, as well as a claim for aiding and abetting retaliatory actions against Plaintiff and intentionally creating a hostile work environment because of Plaintiff's religious beliefs, also in violation of the NYCHRL.

[2]   The facts set forth in this Opinion are drawn from Defendants' Local Civil Rule 56.1 Statement ("Def. 56.1" (Dkt. #40-1)); Plaintiff's Local Civil Rule 56.1 Counterstatement, ("Pl. 56.1" (Dkt. #49-1)); Defendants' Response to Plaintiff's Local Civil Rule 56.1 Counterstatement ("Def. 56.1 Reply" (Dkt. #51)); as well as exhibits appended to the Declaration of Amanda M. Blair ("Blair Decl., Ex. [ ]" (Dkt. #40)), including certain deposition transcripts, which are cited using the convention "[Name] Dep."  The Court notes that the Declaration of Mark D. Shirian enclosed a set of exhibits that are nearly identical to those appended to the Blair Declaration.  (*See* Dkt. #49).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Additionally, to the extent that Plaintiff purports to dispute facts in Defendants' Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.

sundown on Saturday nights.  (Def. 56.1 ¶ 11).  He is also unable to work on certain Jewish holidays.  (*Id.*).  Plaintiff was employed as a Youth Development Specialist ("YDS") with ACS between August 6, 2018, and November 19, 2018. (*Id.* at ¶¶ 12, 16, 145).  In this capacity, Plaintiff was assigned to Crossroads, a detention facility for youth residents awaiting transfer to an upstate facility or release to an appropriate program.  (*Id.* at ¶ 23).  During this time period, Crossroads was supervised by Nedderman, its Director of Operations.  (*Id.* at ¶ 24).

ACS maintains an Absence Control Policy, which requires that employees notify their immediate supervisor, director, or manager when requesting to be excused from work.  (Blair Decl., Ex. O at 11 ("Absence Control Policy" or the "Policy")).  The Policy provides that: "Failure to contact a supervisor, director, or manager within the requisite time will result in the employee being considered Absent without Leave (AWOL)."  (*Id.* at 4).  Under the Policy, an employee can be deemed "AWOL" for, *inter alia*, "failure to report to work without approval/authorization"; "failure to call in within established timeframes"; "early departure without prior authorization"; and "failure to notify his/her supervisor of an absence ... if the supervisor does not approve the leave on City Time [ACS's time entry system]."  (*Id.* at 5).  Moreover, the Policy tasks "immediate supervisors, managers, Directors, and the Director of Administration" with "monitor[ing] the attendance records of all staff members

---

For ease of reference, Defendants' opening brief is referred to as "Def. Br." (Dkt. #39); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #48); and Defendants' reply brief as "Def. Reply" (Dkt. #50).

assigned to their facility and … counsel[ing] and address[ing] any staff member

who appears to be developing a pattern of AWOL." (*Id.* at 12).

### 2. Plaintiff's Initial Employment with ACS

Plaintiff interviewed for a YDS position with ACS on June 30, 2018. (Def.

56.1 ¶ 12; *see also* Blair Decl., Ex. I ("Candidate Evaluation Sheet")). During

his interview, Plaintiff represented that he was "willing *and able* to work on

Saturdays, Sundays and holidays" as well as "mandatory overtime."

(Candidate Evaluation Sheet 3 (emphasis added)). Conversely, Plaintiff did not

indicate that he would require any religious accommodations. (*See id.*; *see also*

Livingston Dep. 74:25-75:2). Plaintiff has since explained that he did not want

to be "judged" for his observation of the Sabbath. (*See* Livingston Dep. 75:13-

15 ("I just said I could work on the weekends. I didn't want to be judged on the

fact that I couldn't work on Saturdays.")). He also opted not to wear his

yarmulke during his interview. (*Id.* at 66:15-17).

After obtaining the position, Plaintiff began attending YDS's training

program on August 6, 2018. (Def. 56.1 ¶ 16; *see also* Blair Decl., Ex. J at 1

("Pl. Timesheets")). Plaintiff testified that he wore a necklace to work with a

pendant of the Jewish letter "Chai." (Def. 56.1 ¶ 15). Although he was not told

that he could not wear his yarmulke at work, he elected to keep it in his pocket

or leave it in his locker. (*Id.*; *see also* Livingston Dep. 64:24-66:14, 161:14-16).

As part of Plaintiff's YDS training, he was told about ACS's Office of Equal

Employment Opportunity ("EEO"), as well as the process for requesting a

religious accommodation. (Def. 56.1 ¶ 17). The training also covered religious

discrimination.  (*Id.*).  Based on this training, Plaintiff understood that the process for requesting a religious accommodation involved "fill[ing] out the paperwork with the EEO and submit[ting] all the necessary documents." (Livingston Dep. 74:10-15).

The schedules Plaintiff kept during his training period, as well as his statements in this litigation about those schedules, are in some tension with his later accommodation requests.  For example, from August 5, 2018, through August 25, 2018, Plaintiff worked Mondays through Fridays from 9:00 a.m. to 5:15 p.m.  (Def. 56.1 ¶ 18; *see also* Livingston Dep. 74:19-20; Pl. Timesheets 1, 4, 8).  When asked, Plaintiff explained that he did not make a request with the EEO for a religious accommodation during this period because he had not yet been given a permanent schedule.  (Livingston Dep. 74:16-24).  Of potentially greater significance, during the week of August 26, 2018, through September 1, 2018, Plaintiff worked Monday through Friday from 3:00 p.m. to 11:15 p.m.  (Def. 56.1 ¶ 18; Pl. Timesheets 11).  Plaintiff's schedule changed again the following week, the week of September 2, 2018, through September 8, 2018, and he worked Tuesday through Friday from 9:00 a.m. to 5:15 p.m.  (Def. 56.1 ¶ 18; Pl. Timesheets 14).  The Jewish holiday of Rosh Hashanah began on September 10, 2018, and ended on September 11, 2018. (Def. 56.1 ¶ 19).  Plaintiff worked from 9:00 a.m. to 5:15 p.m. on September 10, 2018, and was scheduled to work the same shift the following day.  (*Id.*; Pl. Timesheets 17).  However, Plaintiff did not come to work on September 11, 2018, and he was marked as being on unscheduled leave without pay

("LWOP").  (Def. 56.1 ¶ 19; *see also* Blair Decl., Ex. K at 2 ("Pl. Leave Requests Report")).

Plaintiff recounted that he started "on-the-job" training on September 18, 2018.  (Livingston Dep. 85:13-15).  At that time, he was given the 3:00 p.m. to 11:00 p.m. shift.  (*Id.*).  According to Plaintiff, he emailed David Nunez, a training officer at ACS, on or about September 18, 2018, to request that he be assigned the 7:00 a.m. to 3:15 p.m. shift the following day, to allow him to observe the holiday of Yom Kippur.  (Def. 56.1 ¶ 20).[3]  He also asked that he be assigned the same shift that Friday, September 21, 2018, explaining that he could not perform the night shift given that the Jewish Sabbath began at sundown.  (*Id.*).  Plaintiff recalled that he did not hear back from Nunez.  (*See* Dkt. #1 at ¶ 33).  Plaintiff was scheduled to work on September 18 and 19, 2018; he did not come to work on those days and was marked "unscheduled LWOP."  (Def. 56.1 ¶ 22; Pl. Leave Requests Report 2).

### 3.    Plaintiff's Assignment to Crossroads

Following Plaintiff's participation in the ACS training program, he was assigned to Crossroads.  (Def. 56.1 ¶ 23).  Plaintiff's direct supervisor at Crossroads was Brian Barnes.  (*Id.* at ¶ 24).  Upon Plaintiff's initial assignment to Crossroads, on September 20 and 21, 2018, he worked from 7:00 a.m. to 3:15 p.m.  (*Id.* at ¶¶ 25-26; *see also* Pl. Timesheets 21).  On those two days, he

---

[3]    This appears to have been Plaintiff's first request for time off for a religious holiday. (Livingston Dep. 72:13-73:22).  Plaintiff's recollection of this exchange has not been separately corroborated, as his email to Nunez is not included in the record before the Court, and Nunez does not appear to have been deposed in connection with this litigation.

was assigned to the Special Housing Unit ("SHU") (Def. 56.1 ¶¶ 25-26; *see also* Blair Decl., Ex. N at 1-2 ("Tour Logs")), which houses residents with medical conditions or mental health referrals (Def. 56.1 ¶ 25; *see also* Nedderman Dep. 107:5-107:9).

On Sunday, September 23, 2018, Plaintiff emailed Nunez to inquire about the status of his "permanent schedule." (Blair Decl., Ex. P at 2 (September 23, 2018 email from Plaintiff to Nunez)). He also explained that the next two days were the Jewish holiday of Sukkot, and that he had let EEO know that he would not be able to work. (*Id.*).[4] Nunez responded later that day that he would forward Plaintiff's email "to the folks [in] charge of scheduling." (*Id.*). Nedderman testified that he discussed Plaintiff's request with Nunez, and that he granted the request because it was "not a schedule change," and because Nedderman was "allowed to grant days here and days there." (Nedderman Dep. 79:21-81:14). Plaintiff was marked "unscheduled LWOP" from September 23, 2018, through September 25, 2018. (Pl. Timesheets 25; Pl. Leave Requests Report 2).[5] Plaintiff indicated in his leave requests report that he had taken the days off for "religious holidays" and that

---

[4]    There is no separate indication in the record before the Court that Plaintiff contacted EEO to request time off for the holiday. The first exchange between Plaintiff and EEO appears to have taken place on October 9, 2018. (*See* Blair Decl., Ex. R at 1 (October 9, 2018 email from Plaintiff to Jessica Cooke)).

[5]    As discussed above, ACS maintains an Absence Control Policy that sets forth the circumstances in which an employee will be deemed "AWOL." (Absence Control Policy 5). Nedderman testified that "LWOP" and "AWOL" are effectively "almost identical" types of absences, in that both are absences without pay. (Nedderman Dep. 38:21-39:2). As described by Nedderman, "AWOL" is used to indicate a "no call/no show" situation, where an employee did not "call out," or provide their supervisor with advance notice of their absence. (*Id.* at 39:2-7; *see also id.* at 38:16-17 ("You only get marked for AWOL when you don't call or show up.")).

the "administration was aware" and "supervision [had] approved." (Pl. Leave Requests Report 2).

On September 25, 2018, Plaintiff again emailed Nunez that he had not yet received his permanent schedule. (Blair Decl., Ex. P at 2 (September 25, 2018 email from Livingston to Nunez)). Nunez added Nedderman to the email so that the latter could "provide some clarity" regarding Plaintiff's schedule. (Id. at 1). Nedderman responded: "Come in the AM." (Id.). Nedderman testified that his email was directed at Nunez, and that he intended to meet with Nunez the following morning to discuss Plaintiff's situation. (Nedderman Dep. 77:20-78:22). The following day, Wednesday, September 26, 2018, Plaintiff worked from 6:55 a.m. to 3:48 p.m., and was assigned to the SHU. (Def. 56.1 ¶ 36; Tour Logs 3). That same day, Plaintiff and the rest of his training class were provided with their permanent schedules. (Def. 56.1 ¶ 37). According to Plaintiff's permanent schedule, he was assigned to work Mondays, Tuesdays, and Fridays through Sundays from 7:00 a.m. to 3:15 p.m. (Id.; see also Blair Decl., Ex. M at 5 (October 5, 2018 Crossroads Staff Roster (reflecting that Plaintiff's "pass days" were Wednesdays and Thursdays))).

### 4. Plaintiff's Schedule Changes, Absences, and Initial Conferences with Supervisors

Plaintiff took issue with his permanent schedule at Crossroads, as it required that he work during the Sabbath. (Livingston Dep. 63:17-18, 97:21-98:23). Nedderman testified that employees who cannot work their assigned schedule are notified that they should request an accommodation, such as a schedule change, through EEO. (Nedderman Dep. 20:19-21:4, 26:11-17; see

*also id.* at 44:10-11 ("I can't do schedule overrides without EO sending me a letter.")).  And Plaintiff acknowledged that Nedderman specifically instructed him to contact EEO to request a religious accommodation and schedule change.  (Livingston Dep. 99:12-14; *see also* Nedderman Dep. 45:12-16).  Plaintiff testified that he nonetheless hoped that Nedderman would change his schedule, which, as was made clear, Nedderman lacked the power to do.  (Livingston Dep. 99:5-11; *see also id.* at 99:9 ("I just didn't think I would have to go to EO.")).

After receiving his permanent schedule, instead of making a formal request to EEO for an accommodation, Plaintiff took it upon himself to work on Wednesdays and Thursdays, instead of Saturdays and Sundays.  (Def. 56.1 ¶¶ 39, 41; *see also* Livingston Dep. 97:22-98:7).  Plaintiff testified that he told Nunez in a call that he would be working Wednesdays and Thursdays "to make up for the days [he] missed on Saturday and the holidays," and that Nunez said he would tell Nedderman.  (Livingston Dep. 89:15-21, 90:5-11).[6]  But Plaintiff neither informed anyone at Crossroads of his decision to change his schedule, nor did he receive approval from Crossroads to vary from his approved schedule.  (Def. 56.1 ¶ 41; *see also* Livingston Dep. 90:8-9).  Plaintiff's Tour Commander, Kim Bobb, testified that Plaintiff did not speak to either his supervisor or tour commander about this schedule change, effectively "eluding the system."  (Bobb Dep. 66:14-67:6).

---

[6]     Once again, this exchange has not been corroborated by Nunez, as he does not appear to have been deposed in connection with this litigation.

Bobb further testified that she only became aware of Plaintiff's need for a religious accommodation when he told her that he needed to leave early on a Friday, and was unable to do a "double" shift.  (Bobb Dep. 18:12-21).  She recalled that Crossroads granted Plaintiff's first request to leave early, but when he continued to ask to leave early on Fridays, they informed him that he was not permitted to continue to leave early because his absence affected coverage.  (*Id.* at 35:6-9).  Bobb explained that Plaintiff could not leave his post because: "[Y]ou can't just leave the residents unattended.  That would be child abuse.  So if [Plaintiff] reports to work on Friday and he has an assignment and there is no other staff to cover his post, he can't leave."  (*Id.* at 36:13-18).

On or about September 26 or 27, 2018, Plaintiff was called into Crossroads's administrative office to meet with Nedderman, Bobb, and Operations Manager Terryann Thomas.  (Def. 56.1 ¶ 43).  He was called into an additional meeting with these same supervisors on September 28, 2018.  (*Id.* at ¶ 55; Livingston Dep. 49:3-11).  Plaintiff testified that during these meetings, he was again told that he needed to submit his "paperwork" to EEO to request a religious accommodation, and that he could not miss scheduled work days until he had been granted a religious accommodation "in writing."  (Def. 56.1 ¶¶ 44, 47; Livingston Dep. 46:4-13, 101:1-18, 112:19-22).  In particular, Plaintiff was told that without the religious accommodation, he could not take off on Saturdays, nor could he leave on Fridays until he had been dismissed.  (Def. 56.1 ¶ 44).

Plaintiff testified that in one of these meetings, Nedderman, Thomas, and Bobb said they would not "believe anything" he said until they received approval in writing from EEO, and would continue "writing [him] up, conferencing [him], and disciplining [him] for not coming in on [his scheduled] days." (Livingston Dep. 32:12-20; *see also* Def. 56.1 ¶ 55). According to Plaintiff, the attendees mused that "[u]ntil we get [approval from the] EEO in writing, how do we know you are even Jewish?  Prove it." (Livingston Dep. 46:14-17). As proof, Plaintiff showed them his "chai necklace." (*Id.* at 46:17). He does not recall any response. (*Id.* at 46:21-23). Plaintiff did not receive any adverse letter or documentation, such as a disciplinary notice, following these conferences. (*Id.* at 47:3-11; Def. 56.1 ¶ 52).

Plaintiff continued to work his self-determined schedule through late September and early October 2018. (Def. 56.1 ¶¶ 53-54, 58-67). He did not work on Saturdays or the Jewish holidays of Sukkot, Shemini Atzeret, and Simchat Torah. (*Id.* at ¶¶ 58, 60-62, 67). On those days, Plaintiff's leave records reflected that he was either on "unscheduled LWOP," "Sick Leave - undocumented," "Absence Without Leave," or "Religious observance/holiday." (*Id.*; Pl. Leave Requests Report 2). Plaintiff further indicated in his leave requests report that he was taking those days off for "Sabbath Observance" or "Religious Observance." (Def. 56.1 ¶¶ 58, 61-62; Pl. Leave Requests Report 2). During the days that he did work, Plaintiff was often assigned to the SHU. (Def. 56.1 ¶¶ 53-54, 63, 66).

11

Nedderman and Bobb eventually learned that Plaintiff had created his own work schedule. (Def. 56.1 ¶¶ 80-82). Nedderman testified that he found out when he passed by Plaintiff at Crossroads on a day that should have been his day off. (Nedderman Dep. 31:17-32:7). When asked why he was at work, Plaintiff responded that he was coming in on his days off so that he could take off Friday and Saturday. (*Id.*). Nedderman informed Plaintiff that he was not allowed to create his own work schedule, and asked Plaintiff's supervisor to conduct an investigation into Plaintiff's attendance record. (*Id.* at 32:8-11, 33:10-16, 34:20-35:13). For her part, Bobb recalled that Plaintiff inquired about the status of his paycheck, and upon reviewing Plaintiff's time entry records, she realized that he had created his own schedule. (Bobb Dep. 25:7-17). She informed Plaintiff that his time sheets could not be processed because he had not been working the days he was scheduled to work, and that his time sheets would need to be corrected in order for him to receive his paycheck. (*Id.* at 26:2-14). The parties dispute whether this paycheck issue was resolved. (Def. 56.1 ¶ 83, Pl. 56.1 ¶ 83).

Saturday, October 6, 2018, was a day that Plaintiff was scheduled to work, but he did not and was marked "LWOP - AWOL." (Def. 56.1 ¶ 67). In response to Plaintiff's burgeoning absenteeism, Nedderman emailed Crossroads officers to advise them that:

> [Plaintiff] has not been authorized to be out on Saturdays due to a religious circumstances by DO Nedderman. He was directed to contact EEO for the Division to make a determination as a request of this nature are not granted at the facility level.

> EEO has not contacted the facility on his request.  We
> should be conferencing, documenting, and following all
> time and leave procedures as it pertains to [Plaintiff].

(Blair Decl., Ex. Q at 1-2).  Nedderman's email indicated that the leeway

previously given by Crossroads officers to Plaintiff was coming to an end.  Bobb

responded, pointing out some practical difficulties with this approach.  She

noted, first, that it would be "hard to conference [Plaintiff] for not coming in" as

the prior day, Nedderman had informed Plaintiff that the Saturdays he was

taking off would be "leave without pay."  (*Id.* at 1).  She further noted that

Plaintiff's leave requests reflected that the administration was aware of his

religious observation, and that she and Barnes had "final approved" those

requests.  (*Id.*).  She stated: "[M]oving forward to tell [Plaintiff] he will not have a

day off for his religious belief is going to be an issue."  (*Id.*).  Nedderman

responded: "[W]e will discuss on Tuesday."  (*Id.*).

Nedderman's new position ultimately won out.  Plaintiff was

subsequently marked "LWOP - AWOL" on Monday, October 8, 2018, after he

reported that he had a "stomach virus" and that it was a "family emergency."

(Def. 56.1 ¶ 70; Pl. Leave Requests Report 2).  Plaintiff's leave requests were

cancelled within ACS's time entry system, and Bobb instead approved his leave

request as "Absence without leave."  (Pl. Leave Requests Report 2).  Plaintiff did

not work as scheduled during the weekend of October 13, 2018, and October

14, 2018.  (Def. 56.1 ¶¶ 91-92).  While he submitted leave requests indicating

that his absences were due to "religious observance" and a "family

engagement," respectively, his requests were cancelled, and he was marked "awol." (Pl. Leave Requests Report 1).

### 5. Additional Meetings and Interactions with Crossroads Supervisors

Plaintiff testified that on or about October 10, 2018, he had an additional conference with Nedderman, Thomas, and Bobb. (Livingston Dep. 113:1-14). This conference embodied the approach suggested in Nedderman's October 6 email: Plaintiff was instructed to provide Crossroads with advance notice of any absences for religious observances until he received his accommodation from EEO. (*Id.* at 115:1-5). Specifically, he was told that he would need to "call out" every Saturday that he was scheduled to work and that those absences would be considered leave without pay, or "LWOP." (*Id.*). In his deposition, Nedderman explained that if Plaintiff called Crossroads to notify them in advance, his absence would be considered "LWOP," but that if he failed to call, he would be marked "AWOL," and considered a "no call/no show." (Nedderman Dep. 38:8-39:7). Plaintiff explained that he was unable to make those calls, as he could not use a phone during the Sabbath. (Livingston Dep. 115:4-5). While he was told that he could call out on Friday evenings after leaving work, Plaintiff did not believe that option to be workable, as the Sabbath began at sundown. (*Id.* at 115:13-18). During either the October 10, 2018 conference, or an additional conference, Plaintiff was scolded by Nedderman, Thomas, and Bobb for working on Wednesdays and Thursdays. (Def. 56.1 ¶ 79; Livingston Dep. 90:12-91:21). Following that conference,

14

Plaintiff stopped working on Wednesdays and Thursdays.  (Def. 56.1 ¶ 79;
Livingston Dep. 91:10-12).

Plaintiff recalled that, separate and apart from the formal conferences
with Nedderman, Thomas, and Bobb, he was informally "scolded and
reprimanded" by his supervisors for not having yet received his religious
accommodation.  (Livingston Dep. 48:23-24, 49:20-22).  Plaintiff recalls that
Nedderman told him:  "You better get that paperwork.  Until you get that
paperwork you can't leave. …  I can't believe you didn't get the paperwork."  (*Id.*
at 51:6-10).  Nedderman also told Plaintiff:  "You need to get your stuff
together.  This is unacceptable.  You can't be missing Saturdays."  (*Id.* at
44:13-17).  Nedderman testified that he had "several conversations [with
Plaintiff] in passing in the hallway," where he asked as "a concerned manager"
whether Plaintiff had "reached out to [EEO] about his accommodation."
(Nedderman Dep. 45:22-46:2).

Plaintiff also testified that on one occasion, when leaving Crossroads on a
Friday afternoon after ensuring there was proper coverage, he was scolded by a
Supervisor Campbell for leaving before the rest of his colleagues.  (Livingston
Dep. 49:24-50:11).  Campbell asked if Plaintiff had "brain amnesia," and
wondered "[w]hat [made Plaintiff] think [he could] leave until everyone else
[could] leave?"  (*Id.* at 50:9-11).  Plaintiff explained that it was the Sabbath, and
Campbell rejoined that it did not matter what his religion was.  (*Id.* at 50:11-
12, 58:1-2).  Plaintiff returned to his hall as directed, but called for a more
senior supervisor, and after waiting "another half an hour or so," was allowed

15

to leave the facility, although he was "made [to] wait in the back [of the line]." (*Id.* at 58:2-20).

Plaintiff recalled that towards the end of his employment with ACS, his hall assignments were changed and he was placed in the "worst halls" with the "worst kids." (Livingston Dep. 102:2-20, 151:2-9). In particular, he testified that he was more often assigned to escort residents to court, and given more "one-on-one responsibilities with some of the more volatile ... and violent kids." (*Id.* at 37:18-21; *see also* Def. 56.1 ¶¶ 71, 93 (indicating that Plaintiff was assigned to "Court Services" on Tuesday, October 9, 2018, and Monday, October 15, 2018)). While Plaintiff's duties were the same at each hall location, when he was assigned to transport residents to court, given traffic, there was "no guarantee" that he would return to Crossroads by the time his shift ended at 3:25 p.m. (Livingston Dep. 105:15-25; *see also* Def. 56.1 ¶¶ 71, 93 (indicating that Plaintiff worked from 6:53 a.m. to 3:57 p.m. and 6:41 a.m. to 3:55 p.m. on the Monday and Tuesday that he was assigned to Court Services)). Plaintiff also testified that he was assigned to the SHU, where residents were "volatile" and could "snap in a second." (Livingston Dep. 39:22, 41:9-16).[7] Plaintiff believed he was given these assignments because of his

---

[7]     Plaintiff's recollection of the evolution of his assignments is not entirely borne out by the record. It appears that during his time at Crossroads, Plaintiff was only twice assigned to Court Services posts, on October 9, 2018, and October 15, 2018. (*See generally* Tour Logs). Moreover, Plaintiff was first posted to the SHU upon his initial assignment at Crossroads, rather than towards the end of his stint there. (*See* Def. 56.1 ¶¶ 24-25, 36, 53-54, 63, 66 (reflecting that Plaintiff was assigned to the SHU on September 20-21, 2018, September 26-28, 2018, October 3, 2018, and October 5, 2018)).

absences.  (*Id.* at 48:7-14).  He also testified that at times, he would be notified by his supervisor or tour commander mid-shift that his assignment had been changed.  (*Id.* at 102:2-103:16, 106:9-107:5).[8]

Plaintiff testified that he did not feel "safe" at Crossroads because of "all the conferencing and all the hostile and aggressive and belittling comments towards [him]."  (Def. 56.1 ¶ 121; Livingston Dep. 127:19-21).  Those "belittling" comments included the statements discussed previously, as well as what Plaintiff described (but could not detail) as "constant questioning and accusations that [he was] not Jewish."  (Livingston Dep. 119:3-5).  Plaintiff also found it "humiliating" to be called over the radio to conferences in front of his peers, as it looked like he was being disciplined for his work.  (*Id.* at 119:5-11).

### 6.    Plaintiff's Last Day at Crossroads

On October 16, 2018, Plaintiff had a formal conference with Barnes and Supervisor Traci Talley.  (Def. 56.1 ¶ 98; *see also* Blair Decl., Ex. V (October 16, 2018 email from Barnes to Nedderman and other ACS employees enclosing documentation of his meeting with Plaintiff)).  Barnes was responsible for monitoring his staff's attendance records, and he noticed that Plaintiff's time entry records reflected that he had "missed a lot of days from work."  (Barnes Dep. 19:2-11).  Plaintiff testified that he was called "on the radio" into the meeting, instructed to sit down, and that Talley "stood by the door blocking

---

[8]    Bobb testified that YDS supervisors assign their supervisees' posts and that tour commanders ensure that all posts are covered.  (Bobb Dep. 43:21-44:4).

[it]." (Livingston Dep. 33:22-34:3, 49:12-19).  He further testified that the door was locked.  (*Id.* at 34:5-6, 34:21-23).[9]

During the conference, Barnes handed Plaintiff documents listing the days of work that he had missed in September and October.  (Livingston Dep. 34:1-3; *see also* Blair Decl., Ex. V at 3, 5-6 (listing the dates of Plaintiff's absences, as well as the "reason" and "remarks")).  Barnes drafted two memoranda reflecting that Plaintiff had fourteen "unscheduled/excessive absences" during this period, eight of which were "Leave without Pay."  (Blair Decl., Ex. V at 5).  The first memorandum stated: "YOUR TIME AND LEAVE RECORD IS UNSATISFACTORY AND YOU ARE TO BE AWARE THAT THIS MAY RESULT IN DISCIPLINARY ACTION OR TERMINATION."  (*Id.* at 2).  The second memorandum provided that Plaintiff's "unacceptable" attendance record would be reflected in his next performance evaluation, and would have a "negative impact" on his "performance ratings."  (*Id.* at 6).  Plaintiff testified that during the conference, Barnes told him "maybe this job isn't for you," and that "veterans" at Crossroads would not be happy if he were given Saturdays off.  (Livingston Dep. 32:1-6).  Plaintiff refused to sign the memoranda to indicate that he had been given a copy of the documents.  (*See* Blair Decl., Ex. V at 3, 6 (reflecting that Plaintiff "refused to sign")).  Barnes responded, "no problem,"

---

[9]    Barnes testified that he had never locked Plaintiff in a room.  (Barnes Dep. 55:17-21, 56:2-4).  He further testified that while certain rooms in the Crossroads facility will automatically lock when closed, those are not the offices and conference rooms used for meetings with Plaintiff.  (*See id.* at 56:14-57:13).

and explained that the documents would be placed in Plaintiff's personnel file, and he would not be given a copy.  (Livingston Dep. 35:24-36:6).

Barnes recalled the same meeting, and specifically recalled Plaintiff explaining that he was "having issues coming to work"; in response, Barnes referred Plaintiff to ACS's "Employee Assistance Program" for "counseling directly related to [his] needs."  (Barnes Dep. 29:25-30:8; *see also* Blair Decl., Ex. V at 9 (October 16, 2018 EAP Referral)).  Barnes explained that the Employee Assistance Program was utilized by employees who had issues with attendance that were affecting their work.  (Barnes Dep. 30:4-30:8).  Barnes also recalled referring Plaintiff to Nedderman to discuss his religious accommodation request.  (*Id.* at 55:3-7).

The same day, Barnes emailed Nedderman and other ACS employees, writing that following his assignment to the "supervisory tree" he had determined that Plaintiff had severe time and leave issues, and his opinion was that Plaintiff should be referred for discipline.  (Blair Decl., Ex. V at 1).  Barnes enclosed the documentation of his formal conference with Plaintiff, a "Facility Level Discipline Supervisor's Complaint Report," and Plaintiff's referral to the Employee Assistance Program.  (*See id.*).

Later that day, while Plaintiff was assigned to the SHU, an incident arose with an "out of control" resident.  (Def. 56.1 ¶ 103; Livingston Dep. 53:8-9).  According to the incident report later prepared by Plaintiff, the resident "became upset when he was not allowed to enter his room due to [his] use of inappropriate vulgar statements."  (Def. 56.1 ¶ 103; *see also* Blair Decl., Ex. W

(Crossroads Resident Incident Report); Livingston Dep. 163:18-23).  The resident threw a deck of cards at Plaintiff, who was not hit.  (Def. 56.1 ¶ 103). The resident then grabbed a phone and attempted to attack Plaintiff and another YDS, punching Plaintiff on his arm and spitting on both Plaintiff and the other YDS.  (*Id.*).  Plaintiff testified that after the incident, he saw another supervisor named "Carbone" give the resident a candy bar, which Plaintiff interpreted as a "clear attack towards [him]."  (*Id.*; Livingston Dep. 54:1-25).[10]

### 7.  Plaintiff's Discussions with EEO and His Union, EEO's Granting of Plaintiff's Accommodation, and Plaintiff's Resignation

Plaintiff testified that he first reached out to EEO to submit a request for a religious accommodation in early October 2018, fully two months after he started work at ACS and after (if not as a result of) the numerous conferences with Crossroads supervisors.  (Livingston Dep. 111:24-112:9).  He testified that he contacted Jessica Cooke, ACS's Americans with Disabilities Act coordinator, who at the time, was also assisting employees who requested work accommodations.  (Livingston Dep. 98:24-99:4; Cooke Dep. 6:17-18, 7:23-8:5). During Plaintiff's training in August 2018, he was provided with the contact information for Cooke and EEO.  (Livingston Dep. 100:14-17).

---

[10]     Plaintiff gave somewhat inconsistent testimony about Carbone's knowledge of his religious beliefs and practices.  When first asked, Plaintiff testified that Carbone had not inquired about Plaintiff's religion, and that while Plaintiff "assumed" Carbone was aware of his religion, he was not certain.  (Livingston Dep. 53:2-5, 107:6-14).  Later in his deposition, Plaintiff testified that he had told Carbone that he left early on Fridays because he was observing Sabbath.  (*Id.* at 162:21-163:9).

Cooke testified that based upon her review of Plaintiff's file, she first heard from Plaintiff on October 9, 2018. (Cooke Dep. 16:4-8; *see also* Blair Decl., Ex. R at 1 (October 9, 2018 email from Cooke to Plaintiff stating: "I did not receive any emails from you.")). Plaintiff emailed Cooke and her supervisor, asking about the process for requesting an accommodation such that he would not have to work Saturdays. (Blair Decl., Ex. R at 1 (October 9, 2018 email from Plaintiff)). Cooke responded the same day, enclosing ACS's reasonable accommodation request form, and asking Plaintiff to complete the form and provide a letter from his synagogue in support of his request. (*Id.*). She also asked Plaintiff to call her to schedule an interview. (*Id.*).

On the afternoon of October 10, 2018, Plaintiff emailed Cooke to advise that he had been brought to "the conference room" to speak with the "Executive Director, Tour Commander, and Operation[s] Manager of Crossroads" and that he "didn't like how the conversation went." (Blair Decl., Ex. R at 8). He summarized the guidance he had been given from Nedderman, Bobb, and Thomas, including that he needed to "call out every Saturday and it will be counted as LWOP." (*Id.*). He noted that he had been "advised" "that after every Saturday I don't come in someone will have to 'conference me' about being awol until the documentation from EEO is provided." (*Id.*). He wrote that his supervisors made him "feel very uncomfortable and on edge" and that he felt "a lot of hostility based on [his] beliefs from the administration." (*Id.*). Cooke responded the next morning, asking if Plaintiff could come into her office that day and bring the supporting documentation for his accommodation

21

request.  (*Id.* at 10).  Later that day, Plaintiff emailed Cooke a letter from the rabbi for his synagogue, stating that Plaintiff could not work during the Sabbath — from Friday afternoons at sunset to nightfall on Saturday.  (*Id.* at 11-12).

On October 12, 2018, Plaintiff and Cooke spoke on the phone to discuss his religious accommodation request.  (Def. 56.1 ¶ 89).  Cooke testified that in her notes memorializing the conversation, Plaintiff told her that Nedderman was "understanding." (Cooke Dep. 20:9-15, 68:23-69:6).  In his deposition, Plaintiff disputed that he had provided this characterization of Nedderman. (Livingston Dep. 132:22-133:21).  That same day, Cooke submitted Plaintiff's religious accommodation request to Louis Watts, whom she understood to be in charge of Crossroads, marking her email of "high" importance.  (Blair Decl., Ex. T at 1 (October 12, 2018 email from Cooke to Watts)).

On October 15, 2018, Plaintiff emailed Cooke that he was "feeling and getting a lot of hostility at work from a lot of the supervisors and Tour Commanders."  (Blair Decl., Ex. R at 13).  He reported that he was (i) "taken to the side and lectured about not coming in on Saturday, and told I'll have to be conferenced about it"; (ii) informed that he was going to be assigned to "the area that's well known to be the most chaotic"; and (iii) "told that everyone can leave before [him]."  (*Id.*).  The next day, Cooke emailed Watts to follow up on Plaintiff's religious accommodation request, asking: "Please advise on whether the staffer can be accommodated."  (Blair Decl., Ex. T at 1).  She also conveyed the concerns expressed in Plaintiff's most recent email, and asked: "Can you

22

please clarify what the status of his request is and what recent changes were made to his assignment, if any?" (*Id.*).  Cooke was thereafter informed that Sandra Bryce, rather than Watts, was in charge of Crossroads.  (*Id.* at 3).

On October 16, 2018, Plaintiff sent an email to his union representatives that was similar to his email to Cooke from the prior day, expressing his view that "it's an extremely hostile, and unsafe work environment," and noting as an example that a supervisor had asked him if he had "brain amnesia."  (Blair Decl., Ex. X at 2-3).  He sent another email later that day, stating that "the staff tried to make me sign a paper saying I'm awol every Saturday and for the Jewish holidays I missed and how it'll go on my file and can lead to termination." (*Id.* at 2).  Plaintiff followed up on October 22, 2018, informing his representative that he did not report to work the previous Friday because he was "very confident they wouldn't let me leave on time," and "at this point I fear for my safety." (*Id.* at 1).  His union representative responded the following day, advising Plaintiff to "immediately" contact Bryce.  (*Id.*).  The representative further expressed that he was "not sure" that he understood Plaintiff's safety concerns.  (*Id.*).

Also on October 22, 2018, Bryce emailed Cooke that Crossroads would grant Plaintiff's accommodation, giving him Saturdays and Sundays off.  (Blair Decl., Ex. T at 2 (October 22, 2018 email from Bryce to Cooke)).  Bryce added that the accommodation could be made "effective this week." (*Id.*).  The next day, Cooke called Plaintiff to inform him that he had been granted an accommodation.  (Cooke Dep. 25:6-26:6, 54:8-11).  Plaintiff proceeded to

update his union representative, and said that he would be "reporting back" the next day.  (Blair Decl., Ex. X at 1).  Plaintiff emailed Cooke to inquire whether his supervisors and Payroll would be notified of his accommodation change.  (*Id.*, Ex. R at 17).

That same day, but following Cooke's call with Plaintiff, Bryce informed Cooke that she had told Plaintiff his new days off would be Friday and Saturday, instead of Saturday and Sunday, and that Plaintiff was "fine with that." (Blair Decl., Ex. T at 6).  Cooke testified that she called Plaintiff to obtain his approval for the changed accommodation, but was unable to reach him. (Cooke Dep. 54:8-17).  She further testified that without speaking to him to confirm that he had approved the change, she was unable to finalize the accommodation.  (*Id.* at 56:2-6, 56:21-57:4).

On November 1, 2018, Plaintiff emailed Cooke and apologized for the delay in getting back to her, explaining that he "was having major issues/lost all information with [his] phone." (Blair Decl., Ex. R at 21).  He stated that he did not feel safe returning to work until he received his approval papers.  (*Id.*). Cooke responded the same day, asking Plaintiff to call her.  (*Id.* at 25-26). Cooke testified that she had a call with Plaintiff afterwards, where she informed him of the change in accommodation.  (Cooke Dep. 30:2-7).  She then emailed Bryce that she was "finally able to speak to [Plaintiff]" and that he had accepted the modified accommodation.  (Blair Decl., Ex. T at 6).  Cooke requested certain information "ASAP" to process the request, and asked that Bryce advise Plaintiff's "line of supervision" that he had accepted the accommodation.  (*Id.*).

24

Cooke also proceeded to email Patricia Marin, ACS's Director of Timekeeping, regarding the policy for religious observances.  (*See id.*, Ex. L (November 1, 2018 emails between Cooke and Marin)).  Marin sent Cooke the relevant policy and informed her that employees with no accrued annual leave or compensatory time balances should be "advanced" time for religious observances.  (*See id.* at 1, 4).[11]

Also on November 1, 2018, Plaintiff met with Marin about his paycheck, which had been placed on hold.  (Def. 56.1 ¶ 143).  The following day, Plaintiff

---

[11]  Marin has submitted a declaration attesting that while ACS does not have a written policy on pay reimbursement, when her office is informed by EEO that an accommodation has been granted, an employee will generally be reimbursed for lost pay from the effective date of his accommodation.  (Blair Decl., Ex. Y ("Marin Declaration" or "Marin Decl.")).

Plaintiff argues that because the Marin Declaration is "not notarized," it is "inadmissible and self-serving."  (Pl. 56.1 ¶ 142).  In response, Defendants observe that the declaration is made "pursuant to 28 U.S.C. § 1746 and under penalty of perjury" (Def. Reply 7 n.2 (quoting Marin Decl.)), and moreover, that Plaintiff himself relies upon the declaration in his Rule 56.1 Counterstatement (*id.* (referencing Pl. 56.1 ¶ 170)).  Plaintiff cites to no caselaw in support of his argument, and courts in this District frequently accept declarations submitted "under penalty of perjury."  *See, e.g., Quiles* v. *City of New York*, 978 F. Supp. 2d 374, 381 (S.D.N.Y. 2013) ("[T]he absence of a notarization is not a basis for the Court to refrain from considering [Plaintiff's] post-deposition [declaration].");  *McLaughlin* v. *Cohen*, 686 F. Supp. 454, 457 (S.D.N.Y. 1988) ("[A]lthough prudence counsels that all statements be notarized when feasible, the Ennis Declaration, which recites 'I declare under the penalty of perjury that the foregoing is true and correct,' was technically admissible on the motion for summary judgment.");  *see also* 10B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2738, at 362-63 (4th ed. 2021) ("Since 1976, affidavits no longer need to be notarized and will be admissible if they are made under penalties of perjury; only unsworn affidavits will be rejected.").  Finally, while "a party may not manufacture material facts through the submission of an affidavit or declaration on summary judgment that is contradicted by other evidence," here Marin's declaration is supported by additional evidence in the record, and as such may properly be considered on this motion.  *See United States* v. *Any & All Funds on Deposit in Acct. No. 12671905, Held in The Name of Landlocked Shipping Co. at Wells Fargo Brokerage Servs., LLC, & All Interest & Other Proceeds Traceable Thereto*, No. 09 Civ. 3481 (HB), 2010 WL 3185688, at *6 n.6 (S.D.N.Y. Aug 10, 2010).  (*See* Livingston Dep. 139:10-14 (testifying that Marin informed him that once his religious accommodation was approved, he would receive back pay for the days he was not paid); *see also* Nedderman Dep. 39:8-20, 69:2-21 (testifying that he had the same understanding)).

25

received $43.42 net pay for the pay period of October 14, 2018, through October 27, 2018. (*Id.*; *see also* Blair Decl., Ex. Z (Plaintiff's last pay stub)). On November 7, 2018, Cooke emailed Plaintiff asking that he return her call, and indicating her understanding that Marin had referred Plaintiff to EEO, but that he had not yet visited the EEO office. (Blair Decl., Ex. R at 25). Plaintiff responded the same day, asking Cooke to contact his attorney. (*Id.*).

On November 19, 2018, Plaintiff emailed Barnes, copying Nedderman, Cooke, and his attorney, writing that, "[i]n light of the harassment and discrimination, [he was] constructively discharging [his] employment immediately and [would] not be returning to work." (Blair Decl., Ex. R at 30-31). On November 23, 2018, Cooke responded, stating: "As discussed on October 23, 2018 and on November 1, 2018, the division of youth and family justice granted your reasonable accommodation request. An email was also sent to your attorney on November 14, 2018 indicating this accommodation and that our office will conduct an investigation into your claim." (*Id.* at 30). Cooke testified in her deposition that her supervisor had said that there would be an investigation into Plaintiff's claim, but that she did not recall how the investigation had concluded. (Cooke Dep. 61:9-62:6).

Plaintiff's resignation was memorialized in a letter from ACS dated November 27, 2018. (Blair Decl., Ex. AA). The letter noted that Plaintiff's last day at work was October 16, 2018, and confirmed that his effective date of resignation was November 19, 2018. (*Id.*).

8.     **Testimony of Former Crossroads YDSs**

Two former Crossroads YDSs who attended the ACS training academy with Plaintiff provided testimony about their experiences.  (*See* Jennings Dep.; Lowery Dep.).  The relevant portions of their testimony are summarized below.

a.     **Trevon Jennings**

One former YDS, Trevon Jennings, requested an accommodation from Crossroads due to a conflict with his school schedule.  (Def. 56.1 ¶ 148). Jennings testified that he was given an initial accommodation for the last day of his training program, after requesting it from Nunez (Jennings Dep. 20:23-21:13), but that it was "very difficult" to change his permanent schedule (*id.* at 21:14-23).  He recalled that during the last week of training, upon receiving their permanent schedules, both he and Plaintiff approached Nunez to ask about accommodations (*id.* at 32:12-24), but that "everybody" got "shut down" about their requests the "same day" (*id.* at 33:18-20).  He further recalled that four ACS employees who requested an accommodation did not receive one.  (*Id.* at 63:22-64:14).

Jennings described the process of applying for his accommodation as "stressful," and said that he received "a lot of pushback" from his tour commanders.  (Jennings Dep. 21:25-22:3).  He testified that Nedderman in particular gave him a "huge issue."  (*Id.* at 22:4-6).  After initially requesting his accommodation, he was called into conferences with his supervisors on three or four occasions, and spoken to in "a very disrespectful [and] aggressive manner."  (*Id.* at 35:19-24, 56:5-12).  During these conferences, he was

threatened with discipline, including being marked AWOL if he did not call ahead of any absence. (*Id.* at 57:8-21). Jennings did not contact EEO to request his accommodation, and was never marked AWOL or LWOP. (*Id.* at 65:3-11).

Jennings testified that he approached Nedderman's superiors to discuss the accommodation, and thereafter received a written document that granted him an accommodation for the duration of his school semester. (Jennings Dep. 22:11-15, 23:20-25). But after that point, he felt like he was being "targeted" for going "above a superior." (*Id.* at 22:21-25). In particular, he recalled that Nedderman tried to make "embarrassing" jokes about his "dreads" during roll call (*id.* at 79:20-80:9), and that upon passing him in the hall, Nedderman would say "make sure Jennings is doing some work because we all … know that he don't like to stay" (*id.* at 80:23-81:2).

Jennings further testified that he witnessed similar treatment of Plaintiff by Crossroads supervisors. For example, he recalled Nedderman saying during one roll call: "[W]orking here you won't have a life outside of work, you won't be able to see your children grow, whatever religious practices you have. You need to make sure you are here because we are here to actually make a change for these youth, so our life revolves around the youth." (Jennings Dep. 26:8-17). He also recalled that Plaintiff was called into conferences "under ten times" and that it put "a lot of stress" on him. (*Id.* at 36:8-24). He testified further that Plaintiff was placed in "high-risk halls" with "kids that [were] the most troublesome." (*Id.* at 29:21-25).

Jennings's employment with ACS ended in February 2019, after he was injured in an "altercation" with a resident at Crossroads. (Jennings Dep. 15:12-17). He testified that he terminated his employment because he felt that it was "unsafe" for him to return, and he did not like "the environment of Crossroads'[s] work." (*Id.* at 15:18-16:2).

### b.    Christopher Lowery

Christopher Lowery attended the YDS training with Plaintiff in August 2018. (Lowery Dep. 9:15-10:8). Lowery was injured during the training and began receiving workers' compensation thereafter. (*Id.* at 9:8-14, 11:11-21). He was still receiving workers' compensation at the time of his deposition. (*Id.* at 9:8-14). He testified that at the time he was injured, he was left in a "cell" for "three hours," and that Crossroads did not call an ambulance for him. (*Id.* at 42:12-14). He is considering suing Crossroads for neglect once he is no longer receiving workers' compensation. (*Id.* at 46:20-47:5).

Lowery testified that the supervisors at Crossroads had "their favorite[s]" and would "pick and choose" who among the new staff they wanted to help. (Lowery Dep. 42:18-20). He also testified: "[T]hey did not accommodate any new staff." (*Id.* at 43:2-3). Lowery testified that on the first day of his on-site training, he was sitting at a table with a group of his colleagues, when he overheard a "Sergeant Bob" comment that Plaintiff was not "really Jewish," did not have a religion, and just did not want to "do [the] job." (*Id.* at 15:8-14, 15:22-16:24, 54:15-24, 56:2-22).

**B.     Procedural History**

Plaintiff commenced this action with the filing of his Complaint on June 3, 2019.  (Dkt. #1).  Defendants responded to the Complaint with their Answer on July 26, 2019 (Dkt. #13), and the case was thereafter referred to the Court-annexed mediation program (Dkt. #14).  Following the parties' unsuccessful participation in mediation, an initial pretrial conference before Judge Deborah A. Batts was scheduled for January 9, 2020 (Dkt. #16), and rescheduled for April 9, 2020 (Dkt. #17).  Upon Judge Batts's unfortunate passing, the case was reassigned to this Court, and an initial pretrial conference was rescheduled for April 2, 2020 (Dkt. #19), and subsequently adjourned to April 16, 2020 (Dkt. #20, 21).

On April 10, 2020, the parties submitted a Proposed Case Management Plan and Scheduling Order (Dkt. #23), as well as a joint letter requesting to adjourn the initial pretrial conference so that they might proceed to discovery (Dkt. #24).  The following day, the Court endorsed the Case Management Plan and adjourned the initial pretrial conference *sine die*.  (Dkt. #24, 25).  The parties' discovery deadlines were twice extended (Dkt. #27, 31), and the Court held a post-fact discovery conference with the parties on October 28, 2020 (Minute Entry for October 28, 2020).  At the October 28, 2020 conference, the Court set a briefing schedule on Defendants' motion for summary judgment. (*See id.*).  Defendants' opening papers were thereafter filed on December 4, 2020, and December 5, 2020 (Dkt. #37-40); Plaintiff's opposition papers were

filed on February 15, 2021 (Dkt. #48-49); and Defendants' reply papers were filed on March 8, 2021 (Dkt. #50-51).[12]

## DISCUSSION

### A.   Summary Judgment Under Fed. R. Civ. P. 56

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[13]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

---

[12]   The Court notes that Defendants' opening brief and Plaintiff's opposition brief do not comport with Rule 4.B of its Individual Rules of Practice in Civil Cases, which limits such memoranda of law to 25 pages, unless prior permission has been granted. Defendants' and Plaintiff's submissions each total 28 pages.  Moreover, Defendants' opening brief fails to include a complete table of contents and table of authorities, as also required under Rule 4.B.  While the Court has accepted the briefing for the purposes of the instant motion, it admonishes the parties to be more mindful of the Court's Individual Rules going forward.

[13]   The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  The Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir.

1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v.

*United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593

F.3d 159, 166 (2d Cir. 2010).

**B.     The Court Dismisses Defendants Plaintiff's Claims Against ACS and Crossroads**

At the outset, Defendants note that Section 396 of the New York City

Charter mandates that all actions to recover penalties for the violation of any

law must be brought against the City and not city agencies, unless otherwise

permitted by law.  (Def. Br. 9-10).  ACS is an agency of the City of New York,

and Crossroads is a facility operated by ACS; accordingly, neither is a suable

entity.  *See Friedman* v. *N.Y.C. Admin. for Children's Servs.*, 502 F. App'x 23, 27

n.3 (2d Cir. 2012) (summary order) ("Even though [Plaintiff] brought claims

against ACS, City agencies are not suable entities, and thus, the proper

defendant is the City of New York."); *Emerson* v. *City of New York*, 740 F. Supp.

2d 385, 396 (S.D.N.Y. 2010) ("[T]he Court finds that ACS, the NYPD Firearms

Division, and the NYPD 46th Precinct, as agencies of the City, are not suable

entities and thus dismisses [Plaintiff's] claims against them."); *cf. Gonsalves* v.

*Brooklyn Det. Complex*, No. 15 Civ. 5750 (RRM) (RLM), 2016 WL 1452381, at *2

(E.D.N.Y. Apr. 13, 2016) ("New York City Department of Correction

facilities and the Department of Correction are not suable entities.  The

Brooklyn Detention Center is part of the New York City Department of

Correction, and thus, may not be sued.").

In his opposition, Plaintiff does not dispute that the City of New York is the lone proper City Defendant.  (*See generally* Pl. Opp.).  The Court thus dismisses all claims against Defendants ACS and Crossroads.

## C. The Court Grants Summary Judgment as to Plaintiff's Discrimination Claims Against the City

### 1. Applicable Law

#### a. Discrimination Claims Under Title VII and the NYSHRL

The Court next addresses Plaintiff's discrimination claims.  Claims of religious discrimination under Title VII and the NYSHRL can be framed under theories of disparate treatment or the denial of a religious accommodation.  *See Khan* v. *Fed. Rsrv. Bank of N.Y.*, No. 02 Civ. 8893 (JCF), 2005 WL 273027, at *4 (S.D.N.Y. Feb. 2, 2005); *see generally Elmenayer* v. *ABF Freight Sys., Inc.*, 318 F.3d 130 (2d Cir. 2003).  Plaintiff's Complaint indicates that his discrimination claims are premised on both theories of liability (*see* Dkt. #1), and the Court will consider both below.

Discrimination claims under Title VII and the NYSHRL are analyzed using the burden-shifting framework adopted in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Walsh* v. *N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016); *Tolbert* v. *Smith*, 790 F.3d 427, 434 (2d Cir. 2015).[14] Under this framework,

---

[14]    The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard of the NYCHRL.  *See* A8421/S6577 (as amended by S6594/A8424).  These amendments were signed into law by then-Governor Andrew Cuomo on or about August 12, 2019.  Significantly, however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to

> the plaintiff bears the initial burden of establishing a
> *prima facie* case of discrimination.  If the plaintiff does
> so ... the defendant [must] articulate some legitimate,
> nondiscriminatory reason for its action.  If such a
> reason is provided, plaintiff ... may still prevail by
> showing ... that the employer's determination was in
> fact the result of [discrimination].

*Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation

marks and citations omitted).  To establish a *prima facie* case of discrimination

under a disparate treatment theory, a plaintiff must show: (i) he is a member of

a protected class; (ii) he is qualified for his position; (iii) he suffered an adverse

employment action; and (iv) the circumstances give rise to an inference of

discrimination.  *See Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83

(2d Cir. 2015); *see also Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 107

(2d Cir. 2010).  "The burden of establishing a *prima facie* case is not onerous,

and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75

(citation omitted).

The *prima facie* case requirement does not require that the plaintiff

provide "evidence sufficient to show discriminatory motivation," but rather

creates "a temporary presumption of discriminatory motivation, shifting

the burden of production to the employer and requiring the employer to come

forward with its justification for the adverse employment action against the

plaintiff."  *Littlejohn* v. *City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)

(internal quotation marks omitted).  Once a plaintiff establishes a *prima facie*

---

Plaintiff's claims here.  *See Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019
WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

case of disparate treatment, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment decision. *See Patterson* v. *Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004). "Defendants' burden at this stage is not to prove nondiscrimination.  Instead, defendants must introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Albuja* v. *Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (citation, internal quotation marks, and emphasis omitted).  If the defendant articulates legitimate, nondiscriminatory reasons for the adverse action, "the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory."  *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001); *accord Patterson*, 375 F.3d at 221.  To meet this standard, the plaintiff "must establish 'circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" *Sullivan* v. *N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (quoting *Kirkland* v. *Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).

In contrast, to state a *prima facie* case of religious discrimination in the form of a failure to accommodate, a plaintiff must show that: "[i] they held a bona fide religious belief conflicting with an employment requirement; [ii] they informed their employers of this belief; and [iii] they were disciplined for failure

to comply with the conflicting employment requirement." *Handverger* v. *City of Winooski*, 605 F. App'x 68, 70 (2d Cir. 2015) (summary order) (quoting *Knight* v. *Conn. Dep't of Pub. Health*, 725 F.3d 156, 167 (2d Cir. 2001)). "Once a *prima facie* case is established by the employee, the employer must offer [him] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Baker* v. *The Home Depot,* 445 F.3d 541, 546 (2d Cir. 2006) (quoting *Cosme* v. *Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).

### b.   Discrimination Claims Under the NYCHRL

Claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)); *see generally Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible'" (quoting *Albunio* v. *City of New York*, 16 N.Y.3d 472, 477-78 (2011))).[15]  To establish a *prima facie* case of discrimination under the

---

15      While it is "unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims," *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013), more recent decisions from the Second Circuit have suggested a separate analysis. *See, e.g., Gachette* v. *Metro-N. Commuter R.R. Co.*, 804 F. App'x 65, 67 (2d Cir. 2020) (summary order) ("Under the NYCHRL — which must be analyzed separately from state and federal law claims — Gachette must demonstrate, by a preponderance of evidence, that he 'has been treated less well than other employees' because of his race or national origin." (quoting *Mihalik*, 715 F.3d at 110)); *Emengo* v. *Stark,* 774 F. App'x 26, 29 (2d Cir. 2019) (summary order) ("Emengo's discrimination claims, aside from those brought under the NYCHRL, proceed under the burden-shifting analysis set forth in *McDonnell Dougla*s[.]" (citing *Garcia* v. *Hartford*

NYCHRL, a plaintiff is not required to show an adverse employment action and need only "show differential treatment — that [he] was treated 'less well' — because of a discriminatory intent." *Mihalik*, 715 F.3d at 110; *accord Kops* v. *PPM Am., Inc.*, No. 15 Civ. 1584 (GBD), 2016 WL 7188793, at *5 (S.D.N.Y. Dec. 5, 2016). An employer may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment "only if the record established as a matter of law that discrimination played *no* role in its actions." *Kops*, 2016 WL 7188793, at *5 (citation omitted).[16]

A court considering NYCHRL claims must consider "the totality of the circumstances" and the "overall context in which the challenged conduct occurs." *Ladepo* v. *United Cerebral Palsy of N.Y.C., Inc.*, No. 15 Civ. 7026 (VSB), 2018 WL 4356726, at *11 (S.D.N.Y. Sept. 12, 2018) (quoting *Mihalik*, 715 F.3d at 113). "Ultimately, however, as with Title VII, the NYCHRL 'is not a general civility code,' and where a plaintiff fails to demonstrate that the

---

*Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013); *Lore* v. *City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012))).

[16]    Since the Second Circuit's decision in *Mihalik*, it has not had occasion "to address the standard applicable to failure-to-accommodate claims under the NYCHRL" in the religious discrimination context. *Bob* v. *Madison Sec. Grp., Inc.*, No. 14 Civ. 9727 (KPF), 2016 WL 6952259, at *6 (S.D.N.Y. Nov. 28, 2016) (citing *Weber* v. *City of New York*, 973 F. Supp. 2d 227, 263 (E.D.N.Y. 2013)). However, when considering claims of disability discrimination brought under the NYCHRL, the Second Circuit has required that an employer demonstrate the "lack of a safe and reasonable accommodation" and that granting the accommodation would impose an "undue hardship" on the employer's business. *Lazzari* v. *N.Y.C. Dep't of Parks & Recreation*, 751 F. App'x 100, 102 (2d Cir. 2018) (summary order); *see also Brown* v. *N.Y.C. Dep't of Educ.*, 806 F. App'x 45, 49 (2d Cir. 2020) (summary order) ("For the NYCHRL claim, the employer, not the employee, has the pleading obligation to prove that the employee could not, with reasonable accommodation, satisfy the essential requisites of the job." (citation and internal quotation marks omitted)); *cf. Jones* v. *N.Y.C. Transit Auth.*, 838 F. App'x 642, 644 n.1 (2d Cir. 2021) (summary order) (affirming that under the NYCHRL, "a 'plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive'" to sustain a disability discrimination claim (quoting *Mihalik*, 715 F.3d at 110)).

defendant's conduct was caused 'at least in part by discriminatory or retaliatory motive,' or the defendant demonstrates that the alleged conduct did not exceed 'petty slights or trivial inconveniences,' plaintiff's claim must fail." *Ramirez* v. *Michael Cetta Inc.*, No. 19 Civ. 986 (VEC), 2020 WL 5819551, at *18 (S.D.N.Y. Sept. 30, 2020) (quoting *Mihalik*, 715 F.3d at 113).

## 2. Plaintiff's Disparate Treatment Claims

### a. *Prima Facie* Case

As noted above, to establish a *prima facie* case of discrimination under a theory of disparate treatment, a plaintiff must show: (i) he is a member of a protected class; (ii) he is qualified for his position; (iii) he suffered an adverse employment action; and (iv) the circumstances give rise to an inference of discrimination.  *See Vega*, 801 F.3d at 83; *see also Gorzynski*, 596 F.3d at 107. Here, the parties disagree as to whether Plaintiff has met the third and fourth prongs of his *prima facie* case.

Beginning with the third prong, Plaintiff argues that he suffered several adverse employment actions, including that he was: (i) marked "LWOP" on days that he was absent, and for which he was never reimbursed; (ii) "constantly" conferenced; (iii) referred for discipline; (iv) "deliberately assigned to high-risk children"; and (v) constructively discharged from his employment.  (Pl. Opp. 12-14).  Defendants recognize that Plaintiff's lost pay is sufficient to constitute an adverse action (Def. Br. 12), but argue that he would have received "back pay" once EEO informed Marin, ACS's Director of Timekeeping, that his leave was retroactively approved pursuant to his religious accommodation (Def. Reply 7).

Plaintiff disputes that he would have received any back pay — despite Marin's declaration attesting to the contrary — as ACS does not maintain any written policy requiring such reimbursement.  (Pl. Opp. 13 (referencing Marin Decl. ¶ 3)).  Putting this disagreement to the side for the moment, the Court observes that the Second Circuit has held that even temporarily lost wages can constitute an adverse employment action.  *See Lovejoy-Wilson* v. *NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (finding an adverse employment action where plaintiff was suspended without pay for one week, despite the fact that she was thereafter reimbursed); *see also Jin* v. *Metro. Life Ins. Co.*, 310 F.3d 84, 100 (2d Cir. 2002) ("[T]he lost *use* of wages for a period of time is, by itself, an economic injury that can qualify as a tangible employment action[.]" (emphasis in original)); *Edrisse* v. *Marriot Int'l, Inc.*, 757 F. Supp. 2d 381, 389 n.52 (S.D.N.Y. 2010) ("[S]uspension without pay, even where the lost wages ultimately are reimbursed, constitutes an adverse employment action.").  The Court will thus consider this prong of Plaintiff's *prima facie* case satisfied.[17]

---

[17]    The Court finds Plaintiff's other assertions of adverse employment actions insufficient to sustain a *prima facie* case.  *First*, Plaintiff's experience of being "constantly conferenced" and threatened with discipline does not establish a materially adverse action.  *See Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." (citation omitted)); *Henry* v. *N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. 2014) ("The law in this Circuit is clear that the threat of disciplinary action, without more, does not constitute an adverse employment action.").  Even Barnes's memoranda concerning Plaintiff's absences and recommendation of discipline are not adverse actions (*see* Blair Decl., Ex. V), as they did not result in any disciplinary action.  *See Fletcher* v. *ABM Bldg. Value*, 775 F. App'x 8, 14 (2d Cir. 2019) (summary order) ("[Plaintiff's] disciplinary write ups were not adverse employment actions because they were only notices and did not result in disciplinary action."); *see also Chung* v. *City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015) (summary order) ("[A] negative performance review, without more, does not represent an adverse employment action."); *Greene* v. *Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 157-58 (E.D.N.Y. 2013) (finding that superintendent's recommendation to terminate plaintiff was not adverse

employment action where superintendent was not final decisionmaker and plaintiff resigned before board could vote on recommendation) *cf. Flanagan* v. *N.Y.C. Dep't of Educ.*, No. 13 Civ. 8456 (LAK) (JCF), 2015 WL 11142630, at *9 (S.D.N.Y. Aug. 21, 2015) (determining that "[t]he unsatisfactory ratings [supervisor] gave the plaintiff in his observation reports and annual performance review constituted employment actions" since they were accompanied by "an adverse result").

*Second,* Plaintiff's contention that he was "deliberately assigned to high-risk halls" is conclusory and unsupported. *See Eka* v. *Brookdale Hosp. Med. Ctr.*, 247 F. Supp. 3d 250, 270 (E.D.N.Y. 2017) ("[Plaintiff's] own conclusory statements … cannot give rise to an inference of discrimination.") (collecting cases). Moreover, "[w]here assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not rise to the level of an adverse employment action." *Williams* v. *N.Y.C. Hous. Auth.*, No. 03 Civ. 7764 (WHP), 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008) (citation, internal quotation marks, and alterations omitted); *see also Lopez* v. *N.Y.C. Dep't of Educ.*, No. 17 Civ. 9205 (RA), 2020 WL 4340947, at *7 n.6 (S.D.N.Y. July 28, 2020) (finding that assignment of "the most severely behaviorally challenged students in the school" did not constitute an adverse employment action where plaintiff did not allege that the assignment "resulted in a reduction in his wages, benefits, or job responsibilities"). And lastly, as the testimony of Plaintiff's former co-workers demonstrated, working at Crossroads came with not insignificant safety concerns. Bobb herself testified: "Anyone you work with could be a problem. So there is no such thing as a worst hall." (Bobb Dep. 37:5-6). And both Jennings and Lowery were injured while working at Crossroads — in fact, Lowery is contemplating suing Crossroads for "neglect," and Jennings indicated that he feels that it is "unsafe" to return to Crossroads. (Jennings Dep. 15:14-16:2; Lowery Dep. 9:8-14, 46:20-47:5). Given the apparent risks inherent to employment at Crossroads, the Court does not find Plaintiff's conclusory allegations that he was "deliberately assigned to high-risk halls" to constitute an adverse action.

*Third,* the Court disagrees with Plaintiff's argument that he was subject to a materially adverse employment action in the form of a constructive discharge. (Pl. Opp. 14-15). A constructive discharge occurs when an employer, rather than discharging its employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry* v. *Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). Importantly, "[a]n employee who fails to explore alternative avenues offered by [his] employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." *Simmons-Grant* v. *Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (quoting *Cooper* v. *Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000)). For reasons that will be made evident when the Court turns to Plaintiff's hostile work environment claims, it does not find that the work atmosphere at Crossroads was "so intolerable" that Plaintiff was forced to quit involuntarily. *Cf. Chenette* v. *Kenneth Cole Prods, Inc.*, 345 F. App'x 615, 620 (2d Cir. 2009) (summary order) ("Having failed on her hostile work environment claim, [plaintiff] can neither survive summary judgment on her constructive discharge claim, which requires evidence of even more severe conditions." (citation and quotation marks omitted)). Moreover, given that Plaintiff chose to resign rather than to return to work after being granted his requested accommodation, the Court finds that he did not avail himself of "alternative avenues."

Additionally, it appears that Plaintiff resigned five days after being told that EEO would investigate his hostile work environment claims. (*See* Blair Decl., Ex. R at 30 (November 23, 2018 email from Cooke stating: "An email was also sent to your attorney on November 14, 2018 indicating this accommodation and that our office will conduct an investigation into your claim.")). Given that Plaintiff chose to forgo participation in

Plaintiff next argues that the Court can make out an inference of discriminatory intent from (i) comments made by his supervisors and co-workers, and (ii) disparate treatment he experienced — in particular, that he was the "only one who received a LWOP or AWOL because of his request for religious accommodation." (Pl. Opp. 15-17). To be sure, an inference of discrimination may be discerned from a variety of circumstances, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group." *Chambers* v. *TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations omitted). As to comments made by Plaintiff's supervisors and co-workers, the Court considers the following statements: (i) when Nedderman, Bobb, and Thomas asked Plaintiff: "Prove that you are Jewish. Until we get an EEO in writing, how do we know you are even Jewish? Prove it." (Livingston Dep. 46:14-17);[18] (ii) Lowery's testimony that he

---

this process, it is impossible to know whether the approval of his accommodation and the resolution of the investigation into his claims would have fully addressed any concerns about his supervisors' conduct. *See Stembridge* v. *City of New York,* 88 F. Supp. 2d 276, 284-85 (S.D.N.Y. 2000) (finding no constructive discharge where "plaintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing," as "[i]t is impossible to know whether the hearing could have actually remedied the situation or addressed the supervisor's misconduct because plaintiff chose not to participate in the process"). Thus, to the extent Plaintiff seeks to sustain his federal, state, or city discrimination claims under a theory of constructive discharge, such efforts are unavailing. *See Gonzalez* v. *N.Y.C. Health & Hosp. Corp.*, No. 19 Civ. 2645 (JPO), 2019 WL 2435622, at *9 (S.D.N.Y. June 11, 2019) (noting that the standard for a constructive discharge claim under the NYCHRL "is similar to the federal and NYSHRL standard," and dismissing constructive discharge claims under federal law, the NYSHRL, and the NYCHRL).

18      Plaintiff also asserted that he was subjected to "constant questioning and accusations that [he was] not Jewish" (Livingston Dep. 119:3-4), although he could only recount one such occasion, involving Nedderman, Bobb, and Thomas, in his deposition (*see id.* at

overheard a "Sergeant Bob" comment that Plaintiff was "not really Jewish," did not have a religion, and just did not want to "do [the] job" (Lowery Dep. 15:8-14, 15:22-16:24, 54:15-24, 56:2-22);[19] (iii) Jennings's testimony that Nedderman commented at roll call that "working here you won't have a life outside of work, you won't be able to see your children grow, whatever religious practices you have (Jennings Dep. 26:10-14); (iv) Plaintiff's testimony that during his conference with Barnes he was told "maybe this job isn't for you," and that "veterans" at Crossroads would not be happy if Plaintiff were given Saturdays off (Livingston Dep. 36:12-17); and (v) a comment made by Campbell, another supervisor, asking Plaintiff if he had "brain amnesia," and telling him that he could not leave early, regardless of his religion (*id.* at 49:24-50:11). Defendants argue that these comments "clearly do not suggest religious animosity," but rather, "justifiable" "apparent frustration," and that the views of Plaintiff's former colleagues are "largely irrelevant [and] internally inconsistent." (Def. Reply 8-9).[20]

---

46:14-17). The Court need not consider these conclusory assertions in its assessment of Plaintiff's *prima facie* case. *See Holcomb* v. *Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

[19]   The Court understands that "Sergeant Bob" is not Tour Commander Kim Bobb. Lowery represented that he did not know Sergeant Bob's first name, but recalled that he was a "black man." (Lowery Dep. 16:6-15). The Court understands that Tour Commander Bobb is a woman. (*See generally* Bobb Dep.).

[20]   Defendants also argue that certain testimony provided by Plaintiff's former colleagues "present[s] inadmissible hearsay." (Def. Reply 8-9). In support, Defendants refer the Court to Lowery's testimony that he overheard a "Sergeant Bob" comment that Plaintiff was not "really Jewish," did not have a religion, and just did not want to "do [the] job." (*Id.* at 9 n.3 (referencing Lowery Dep. 15:8-14, 15:22-16:24, 54:15-24, 56:2-22)). However, the Court's understanding is that Lowery's recounting of this event is based on his personal knowledge. As such, the Court does not find his statements to be inadmissible hearsay. *See Howley* v. *Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) ("[T]estimony by [Plaintiff's] informants, on their own personal knowledge, that

In *Henry* v. *Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 150-51 (2d Cir. 2010), the Second Circuit established a four-factor test to determine whether alleged offensive remarks suggest discriminatory bias or are merely "stray remarks," which generally "do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). The test considers:

> [i] who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); [ii] when the remark was made in relation to the employment decision at issue; [iii] the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and [iv] the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Wyeth Pharmaceuticals*, 616 F.3d at 149-50; *accord Fried* v. *LVI Servs., Inc.*, 500 F. App'x 39, 41 (2d Cir. 2012) (summary order).

Considering these factors, the Court finds that the comments recounted by Plaintiff and his former colleagues, taken together, do not support an inference of race discrimination. Notably, a number of these comments were made by supervisors who do not appear to have participated in any adverse actions taken against Plaintiff. *See Mesias* v. *Cravath, Swaine & Moore LLP*,

---

[Defendant] had made such statements would not be hearsay since that testimony would be offered not to prove the truth of his statements but only to prove that he made them."); *see also Schwapp* v. *Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (finding that district court erred in excluding affidavit where declarant alleged that he was present and overheard supervisor's statement, as declarant's "recounting of this event is based on personal knowledge and is sufficiently particular to satisfy [Federal Rule of Civil Procedure] 56(e)"). That said, the Court does not consider any testimony provided by Plaintiff's former co-workers that does constitute inadmissible hearsay. *See Porter* v. *Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[T]he principles governing admissibility of evidence do not change on a motion for summary judgment." (citation and internal quotation marks omitted)).

106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) ("Remarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision." (citing *Zhang* v. *Barr Labs., Inc.*, No. 98 Civ. 5717 (DC), 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000))).  While Plaintiff and Jennings recount statements made by Campbell and a "Sergeant Bob," there is no indication that either supervisor was involved in marking Plaintiff LWOP or AWOL, or in any of the other conduct that Plaintiff considered an adverse action.  Given the absence of any evidence in the record that Campbell and "Sergeant Bob" were involved in any adverse actions against Plaintiff, the Court cannot find that their remarks raise an inference of discrimination.  *See Dixon* v. *Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order) (finding with respect to "an isolated derogatory remark" by someone "who played no role in [plaintiff's] termination," "[w]e have long held that stray comments of this variety do not create an inference of discrimination").

More broadly, the Court agrees with Defendants that the comments largely reflect Plaintiff's supervisors' frustration with (i) his failure to follow the procedures for requesting an accommodation from the EEO, despite having been instructed at the outset to do so, and (ii) his decision to create his own schedule without notifying his supervisors at Crossroads.  *See Yoselovsky* v. *Associated Press*, 917 F. Supp. 2d 262, 279-80 (S.D.N.Y. 2013) (finding that supervisor's response of "I don't want to hear it" when reminded by plaintiff that "the Passover holidays were approaching," was "fairly innocuous" and "simply expressed her frustration with what she perceived as [plaintiff's]

obstructionist attitude and her exasperation with his frequent excuses for his inability to complete work on time, rather than a criticism of his religious practices"); *Rajaravivarma* v. *Bd. of Trs. for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 151 (D. Conn. 2012) (deeming lab director's comment, when told that employee did not have time to clean the lab because he had been on a trip for a Hindu ceremony, that, "I don't care what your religious beliefs are, I don't care about them.  I care about the lab ….  The lab was messy.  I don't care what you were doing, you son-of-a-bitch," did not demonstrate animus towards employee's religion, race, or national origin, but "frustration and anger" over the employee's "dereliction of his responsibility").  Moreover, comments expressing doubt about the sincerity of Plaintiff's religious beliefs do not alone support an inference of discrimination, especially given that Plaintiff's supervisors encouraged him to apply for an accommodation with EEO.  *See Chukwueze* v. *N.Y.C.E.R.S.*, No. 10 Civ. 8133 (JMF), 2014 WL 3702577, at *5 (S.D.N.Y. July 25, 2014) (finding that evidence that supervisor expressed doubts, "perhaps in a hostile or aggressive manner, about whether December 26th was actually a religious holiday" did not "alone support an inference of discrimination").

That said, an inference of discrimination also can be drawn when "similarly situated" individuals were "treated differently."  *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997).  Plaintiff has asserted that he was treated differently from other employees who requested accommodations, in that he was marked LWOP or AWOL on days that he was absent due to the

Sabbath or a religious holiday.  (Pl. Opp. 17).  While, as discussed further below, this assertion is not entirely borne out by the record, given Plaintiff's "minimal" burden to establish a *prima facie* case of discrimination, the Court will consider whether Defendants have articulated a legitimate non-discriminatory reason for the challenged conduct.

### b.    Non-Discriminatory Reason and Pretext

Defendants argue that they have articulated a legitimate, non-discriminatory reason for any adverse actions experienced by Plaintiff. Specifically, given that Plaintiff had not followed established procedures for requesting an accommodation with EEO at the time of his absences, his supervisors had "legitimate reasons" to call him into conferences and mark him LWOP or AWOL.  (Def. Br. 16-17).  Plaintiff responds that this is mere pretext, and argues that Defendants have offered no nondiscriminatory reason for penalizing him for his absences and failing to pay him.  (Pl. Opp. 17-18).

The Court finds that Plaintiff's claims fail at the third stage of the *McDonnell Douglas* analysis.  Defendants have provided legitimate, non-discriminatory reasons for marking Plaintiff LWOP and AWOL, and Plaintiff has failed to identify a genuine dispute of fact that Defendants' proffered reasons are mere pretext for discrimination on the basis of his religious beliefs.  *First*, ACS's own policies emphasize the importance of monitoring employee attendance.  (*See* Absence Control Policy at 1 ("Employee absences weaken [the Division of Youth and Family Justice's] ability to provide essential services. Evaluating, monitoring and taking corrective action of conditions affecting

47

absence and tardiness are effective management tools for ensuring appropriate staff coverage so that the Division's mandates can be met.")).  And Crossroads staff testified that ensuring staff complete their shifts is particularly important to maintaining the safety of the juvenile residents in their charge.  (*See, e.g.,* Bobb Dep. 36:13-18 ("[Y]ou can't just leave the residents unattended.  That would be child abuse.  So if [Plaintiff] reports to work on Friday and he has an assignment and there is no other staff to cover his post, he can't leave.")).  As such, it was not pretext for Plaintiff's supervisors to conference him, to reproach him for leaving early, and, when those efforts failed, to mark him LWOP or AWOL when he was absent — they were enforcing ACS's own supervisory policies, which did not permit Plaintiff to create his own schedule in the absence of an approved religious accommodation.  *See Russell* v. *Aid to Developmentally Disabled., Inc.*, 753 F. App'x 9, 14 (2d Cir. 2018) (summary order) (applying a "neutral attendance policy" "is a neutral reason for the complained of action" (quoting *Kirkland*, 760 F.3d at 225)).[21]

*Second*, Plaintiff's co-worker, Jennings, who requested a non-religious accommodation, testified that he too was called into conferences and

---

[21]    Plaintiff makes the related argument that "Defendants do not and cannot submit that they ever reimbursed Plaintiff for the time he lost due to being marked as LWOP.  This demonstrates pretext and creates an issue of fact."  (Pl. Opp. 18).  The Court disagrees.  In the first instance, both Marin and Plaintiff's supervisors have represented that employees are generally reimbursed for lost pay once their accommodations are granted, despite the absence of a written policy to that effect.  (*See, e.g.*, Marin Decl. ¶ 4; Nedderman Dep. 39:8-20, 69:2-21).  Plaintiff himself testified that Marin told him that once his religious accommodation was approved, he would receive back pay for the days he was not paid.  (Livingston Dep. 139:10-14).  Rather than pursue this option, Plaintiff directed EEO to his attorney (Blair Decl., Ex. R at 25), and proceeded to resign from his position (*id.* at 30-31).  On this basis, the Court does not find that any failure to reimburse Plaintiff demonstrates pretext.

threatened with discipline, further undermining Plaintiff's argument that his supervisors' conduct was pretext for religious discrimination. (Jennings Dep. 57:2-21). In particular, Jennings testified that after requesting his accommodation, he was called into conferences with his supervisors on three or four occasions, during which he was threatened with discipline, including being marked AWOL if he did not call ahead of any absence. (*Id.* at 35:19-24, 56:5-12, 57:8-21). He also testified that he was subjected to "embarrassing" jokes and comments by Nedderman. (*Id.* at 79:20-80:9, 80:23-81:2). *See Russell*, 753 F. App'x at 14 (finding that plaintiff failed to establish pretext where the record showed that defendant disciplined male employees and even terminated them for similar "or even less egregious" conduct).

Plaintiff's contention that he was treated differently from other employees who requested accommodations does not change the outcome of the Court's burden-shifting analysis. (*See* Pl. Opp. 17). In support, Plaintiff cites to Jennings's testimony indicating his belief that Plaintiff was marked LWOP or AWOL because of his request for a religious accommodation. (Jennings Dep. 40:5-9 ("Q. Do you believe that they only said that with respect to giving [Plaintiff] an LWOP or AWOL because of his request for a religious accommodation? A. Yes.")). A plaintiff may show pretext "by demonstrating that similarly situated employees outside the protected class were treated differently." *Primmer* v. *CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009) (citation omitted). However, to be similarly situated, "other employees ... must have been subject to the same standards governing performance

evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Clark* v. *Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 256 (S.D.N.Y. 2015) (citation omitted).

At the outset, the Court finds that Jennings's testimony on this point is purely conclusory and thus cannot create a triable issue of fact. *Gottlieb* v. *Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1995) ("[Plaintiff] cannot defeat [a summary judgment] motion by relying on the allegations in his pleading, ... or on conclusory statements[.]" (internal citations omitted)); *see also Hester* v. *BIC Corp.*, 225 F.3d 178, 182 (2d Cir. 2000) ("[I]n an employment discrimination action, Rule 701(b) [of the Federal Rules of Evidence] bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision."). Moreover, while Jennings testified that he was never marked "AWOL" or LWOP (Jennings Dep. 65:6-11), he did not testify as to whether he had any absences that would have given his supervisors reason to do so. Given that Plaintiff has not demonstrated that Jennings engaged in similar conduct — in particular, creating his own schedule without notifying his supervisors, or failing to appear for scheduled shifts without providing notice — the Court cannot find disparate treatment that would support a finding of pretext. *Cf. Marseille* v. *Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12136 (VEC), 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021) ("Although Plaintiff identified by name many co-workers whom she

50

alleges were treated better than she was, the record is devoid of any evidence of a [similarly-situated] colleague whose documentation was reviewed differently than Plaintiff's, or who was not criticized or disciplined for documentation and treatment lapses similar to Plaintiff's." (internal citations omitted)); *Galimore* v. *City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 285 (S.D.N.Y. 2009) ("If Plaintiff had adduced evidence that co-workers outside of her protected class, with similar performance and attendance records to her own, were not terminated as she was, Plaintiff would have met her burden in raising sufficient evidence to support a rational finding that Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff were pretextual.").[22]

*Third*, as discussed above, the comments made by Plaintiff's supervisors and co-workers were insufficient to make out a *prima facie* case of discrimination, let alone to raise a triable dispute that Defendants' conduct was "more likely than not" a pretext for religious discrimination. *See Galimore*, 641 F. Supp. 2d at 286 ("Plaintiff's burden at this stage is not to demonstrate that her supervisor made a racially-charged comment, but rather 'to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"

---

[22]    Moreover, Jennings testified that four ACS colleagues were denied accommodations. (Jennings Dep. 63:22-64:14). Based on that testimony, it appears that Plaintiff may have been treated better than certain of his colleagues, inasmuch as Defendants granted his initial informal requests to leave early and take days off for religious holidays, and ultimately granted his religious accommodation request once submitted. (*See* Bobb Dep. 35:6-9 (testifying that Crossroads granted Plaintiff's first request to leave early on a Friday); Nedderman Dep. 79:21-81:14 (explaining that he granted Plaintiff's initial request to take off for a religious holiday); Blair Decl., Ex. T at 2 (October 22, 2018 email from Bryce to Cooke granting Plaintiff's accommodation)).

(quoting *Patterson*, 375 F.3d at 221 (internal quotation marks omitted))).  The
unifying thread among the comments recounted by Plaintiff is not animus
towards his religion, but frustration at his failure to follow procedures.  *Cf.*
*McDermott* v. *N.Y.C. Hous. Dev. Corp.*, No. 10 Civ. 2029 (HB), 2011 WL 167836,
at *5 (S.D.N.Y. Jan. 18, 2011) (deeming "comments reflect[ing] a general level of
impatience, irritation, and frustration," but "devoid of any reference to
[plaintiff's] age," "insufficient to support an inference of discrimination").  The
comments do not create a genuine dispute of fact as to whether Defendants'
proffered reasons for marking Plaintiff LWOP and AWOL are pretext for
discriminatory animus.  *Cf. Pena-Barrero* v. *City of New York*, No. 14 Civ. 9950
(VEC), 2017 WL 1194477, at *13 (S.D.N.Y. Mar. 30, 2017) (Defendants'
"hodgepodge of statements reflecting frustration" with Plaintiff's "lack of
productivity and reliability" did not "support an inference that Defendants
sought to terminate him due to his disability, race, or national origin").
Accordingly, the City is entitled to summary judgment on Plaintiff's federal and
state discrimination claims.

### c.    Plaintiff's NYCHRL Discrimination Claim

As discussed above, to establish a *prima facie* case of discrimination
under the NYCHRL, a plaintiff need only show "that [he] was treated 'less
well' — because of a discriminatory intent."  *Mihalik*, 715 F.3d at 110.
Defendants argue that Plaintiff has not provided any evidence demonstrating
that he was treated less well because of his religion.  And the Court finds that
the evidence put forth by Plaintiff only tends to undermine his NYCHRL claim.

As discussed above, Plaintiff's colleague who requested an accommodation for non-religious reasons received treatment similar to Plaintiff — in that he was conferenced repeatedly, threatened with discipline, and publicly embarrassed. (Jennings Dep. 57:12-21, 79:20-80:9, 80:23-81:2).  While Jennings was not marked LWOP or AWOL (*id.* at 65:6-11), there is no indication on the record before the Court that his supervisors had any reason to mark him thusly. Accordingly, Plaintiff has not shown that he has been treated "less well."  Nor has he demonstrated that Defendants harbored any discriminatory intent, for the reasons discussed above.  *Cf. Pena-Barrero*, 2017 WL 1194477, at *15 (finding that no issue of fact was raised as to plaintiff's NYCHRL discrimination claim where "Defendants were concerned about Plaintiff's attendance and absenteeism after Plaintiff had already been granted a reasonable accommodation — and failed to request additional accommodation"). Accordingly, the Court grants summary judgment as to Plaintiff's NYCHRL discrimination claim as well.

### 3. Plaintiff's Failure to Accommodate Claims

"[I]t is an unlawful employment practice ... for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."  *Baker,* 445 F.3d at 546 (citation and internal quotation marks omitted).  Defendants submit that Plaintiff has failed to establish that he was denied a reasonable accommodation, and that summary judgment should be granted as to his discrimination claims for this additional reason.  (Def. Br. 18-20).  To the

extent Plaintiff seeks to sustain his discrimination claims under an alternate failure to accommodate theory, those claims do not survive summary judgment.

      **a.**    ***Prima Facie* Case**

As discussed above, to state a *prima facie* case of religious discrimination in the form of a failure to accommodate, a plaintiff must show that: "[i] they held a bona fide religious belief conflicting with an employment requirement; [ii] they informed their employers of this belief; and [iii] they were disciplined for failure to comply with the conflicting employment requirement." *Handverger*, 605 F. App'x at 70 (quoting *Knight*, 725 F.3d at 167).  Defendants argue that Plaintiff cannot meet the third prong of his *prima facie* case, as (i) neither the conferences nor Barnes's memoranda and referral to discipline constituted adverse employment actions, and (ii) while Plaintiff was not paid for the days he was marked LWOP or AWOL, unpaid leave can serve as a reasonable accommodation.  (Def. Br. 18-19).  Moreover, even were Plaintiff able to establish a *prima facie* case, Defendants argue that he was granted the very accommodation he sought ten days after he first made his request to the EEO office.  (*Id.* at 20).  Plaintiff does not dispute that Defendants granted him a reasonable accommodation, but argues that (i) Defendants did not attempt to reimburse him for the days he was marked LWOP or AWOL, and (ii) he did not

receive "anything in writing" regarding his accommodation, as requested by his supervisors.  (Pl. Opp. 18-19).[23]

Courts have found that a "threat of disciplinary action" is sufficient to establish the third element of a *prima facie* failure to accommodate case.  *See Mines* v. *City of New York/DHS*, No. 11 Civ. 7886 (JGK), 2013 WL 5904067, at *8 (S.D.N.Y. Nov. 4, 2013) ("In order to establish this element, the plaintiff must show that she was 'threatened with discipline' or suffered some 'adverse employment action' for failing to report to work on the days she requested to take off for religious accommodation." (citation omitted)); *see also Khan*, 2005 WL 273027, at *5 (collecting cases).  The Court thus finds that Plaintiff has made out a *prima facie* case, given that he was threatened with discipline on at least two occasions.  (*See* Livingston Dep. 32:18-20 (testifying that Nedderman, Thomas, and Bobb said that they would continue "writing [him] up, conferencing [him], and disciplining [him] for not coming in on [his scheduled] days"); *see also* Blair Decl., Ex. V at 2 (Barnes October 16, 2018 memorandum stating: "YOUR TIME AND LEAVE RECORD IS UNSATISFACTORY AND YOU ARE TO BE AWARE THAT THIS MAY RESULT IN DISCIPLINARY ACTION OR TERMINATION")).

---

[23]    Plaintiff also argues that he was "constructively discharged" before he could "take advantage" of Defendants' accommodation (Pl. Opp. 18), but as discussed above, the Court concludes that Plaintiff did not experience any such constructive discharge, *see supra* note 17.

### b.    Reasonable Accommodation

"Once a *prima facie* case is established by the employee, the employer must offer [him] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship." *Baker*, 445 F.3d at 546.  Defendants have demonstrated that they offered Plaintiff a reasonable accommodation, a fact that Plaintiff does not dispute.  And with respect to Plaintiff's contention that he was "forced to work in an intolerable work environment" prior to receiving his accommodation (Pl. Opp. 19) — which the Court understands to refer to the conferences, comments, and threats of discipline by his supervisors — courts have held that such conduct is "insufficient to salvage claims brought by plaintiffs who were ultimately accommodated." *Jeffrey* v. *Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635, at *17-18 (S.D.N.Y. Sept. 27, 2013) (deeming insufficient "[Plaintiff's] supervisors' at times aggressive resistance to her accommodation requests — e.g., Butler's and Yasin's alleged attempts to 'reprimand' and 'discipline' her in August 2008, Williamson's January 2009 alleged tirade and Aguilar's alleged demand that Plaintiff work with Lizaso-Belir on Saturdays"); *see also Chukwueze*, 891 F. Supp. 2d at 453-54 (finding that plaintiff's failure to accommodate claim was "implausible" despite his argument that "he was initially denied leave" and "his requests [for accommodation] were met with hostility and severe opposition," as

2 of 87

"he was ultimately allowed his requested accommodation" (internal citations and punctuation omitted)).[24]

While Plaintiff asserts that he was not reimbursed for the unpaid leave that he accrued prior to the approval of his accommodation, the record amply demonstrates that had he remained employed at ACS, he likely would have been reimbursed.  (*See* Marin Decl. ¶ 4 ("[A]fter the Timekeeping Office is informed by [EEO] that an accommodation has been granted, the employee will generally be reimbursed for the lost pay from the effective date of his accommodation."); *see also* Nedderman Dep. 39:8-20, 69:2-21; Livingston Dep. 139:10-14).  Moreover, even had Defendants refused to reimburse Plaintiff, courts have held that "unpaid leave can be a reasonable accommodation."  *Jamil* v. *Sessions*, No. 14 Civ. 2355 (PKC) (RLM), 2017 WL 913601, at *8 (E.D.N.Y. Mar. 6, 2017) (collecting cases); *see also McLaughlin* v. *N.Y.C. Bd. of Educ.,* No. 04 Civ. 1270 (FM), 2008 WL 216308, at *14 (S.D.N.Y. Jan. 22, 2008) ("Although [Plaintiff] was not paid while he was away from

---

[24]     Moreover, any discipline Plaintiff experienced can be attributed to his failure to "provide proper notification" of his "conflicting religious belief" "before the time the conflicting employment requirement [arose]."  *Bob*, 2016 WL 6952259, at *9 (citation omitted).  Courts have emphasized the importance of providing "'proper notification' *before* the time the conflicting employment requirement arises in order to give [an] employer 'sufficient notice to allow them to work out a satisfactory arrangement.'"  *See, e.g., id.* (emphasis in *Bob*) (quoting *Hussein* v. *Pierre Hotel*, No. 99 Civ. 2715 (DC), 2001 WL 406258, at *3-4 (S.D.N.Y. Apr. 20, 2001)).  Plaintiff opted not to inform ACS about his need for an accommodation during the hiring process, and did not submit an accommodation request to EEO during his training program, despite being instructed on the process for doing so.  (*See* Livingston Dep. 74:10-20, 74:25-75:15).  The record indicates that Plaintiff first contacted EEO on October 9, 2018, over two months after he started work with ACS.  (*See* Blair Decl., Ex. R at 1).  Plaintiff's assertions that his work environment was "intolerable" are undermined by his own delays in pursuing an accommodation.  Additionally, Plaintiff's disciplinary issues — and the related frustration of his supervisors — can be attributed to these same delays that were well within his own control.

school for [religious services], the Supreme Court has held that an employer's granting of leave without pay for religious observances is generally a reasonable accommodation under Title VII.  Therefore, the BOE did what was required of it, and [Plaintiff] has no viable discrimination claim." (internal citation omitted) (discussing *Ansonia Bd. of Educ.* v. *Philbrook*, 479 U.S. 60, 70 (1986))); *Ansonia*, 479 U.S. at 70 (opining that "requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one").

Lastly, Plaintiff's contention that the accommodation was insufficient because he "never received anything in writing" is unsupported by the record. (Pl. Opp. 19).  EEO advised the administrator in charge of Crossroads to inform Plaintiff's "line of supervision" about his accommodation shortly after speaking with Plaintiff and confirming that he had accepted the modified accommodation.  (Blair Decl., Ex. T at 6 (November 1, 2018 email from Cooke to Bryce)).  And there is no indication that Plaintiff's supervisors would have disregarded this directive from Crossroads's most senior administrator — Nedderman himself indicated to Crossroads officials that Crossroads was awaiting "contact" from EEO regarding Plaintiff's request.  (*See* Blair Decl., Ex. Q at 1-2 (October 6, 2018 email from Nedderman)).  What is more, Cooke testified that the delay in providing Plaintiff with written confirmation of his accommodation was due to Plaintiff's failure to return her calls and emails between October 23, 2018, and November 1, 2018, when she sought to confirm that he had approved his modified accommodation.  (Cooke Dep. 54:8-17,

56:2-5; *see also* Blair Decl., Ex. R at 21 (November 1, 2018 email from Plaintiff to Cooke apologizing for the delay in getting back to her, and explaining that he "was having major issues/lost all information with [his] phone")).[25]  Despite Plaintiff's decision to go incommunicado, it appears that ACS nevertheless communicated the approval of his accommodation request to his supervisors. This does not provide a basis for finding his accommodation not reasonable.

Accordingly, Plaintiff's discrimination claims fail even under a failure-to-accommodate theory, and the Court grants summary judgment as to them in full.[26]

## D.     The Court Grants Summary Judgment as to Plaintiff's Retaliation Claims Against the City

### 1.     Applicable Law

Retaliation claims under Title VII and the NYSHRL are also subject to the aforementioned *McDonnell Douglas* burden-shifting framework.  *See Fincher* v. *Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).  To establish a *prima facie* claim of retaliation, a plaintiff must show: (i) he engaged in protected activity; (ii) the defendant was aware of that activity; (iii) he

---

[25]     Cooke further testified that in the normal course, once an accommodation is accepted by an employee, she sends an email asking the facility to notify the employees' "line of supervision."  (Cooke Dep. 56:19-57:3).  Upon receipt of "official dates in regards to when [the accommodation] was going to start," she would then send "the approval papers."  (*Id.* at 57:3-8).

[26]     Plaintiff is also unable to meet the standards of the NYCHRL as he has not shown that Defendants failed to offer him a reasonable accommodation.  *See Weber*, 973 F. Supp. 2d at 263-64 (dismissing NYCHRL religious discrimination claim where defendant accommodated plaintiff's religious practices and "there is no evidence that Plaintiff was ever disciplined in connection with those accommodations or required to forego his religious practices"); *cf. Stryker* v. *HSBC Secs. (USA)*, No. 16 Civ. 9424 (JGK), 2020 WL 5127461, at *12 (S.D.N.Y. Aug. 31, 2020) (dismissing NYCHRL disability discrimination claim where plaintiff failed to show that defendant's alternative accommodation was not reasonable).

suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action. *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam).  If the plaintiff succeeds in establishing a *prima facie* case of retaliation, creating a presumption that his employer retaliated against him, the employer must "produc[e] evidence that the adverse employment actions were taken for a legitimate, non-retaliatory reason." *Giscombe* v. *N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 400 (S.D.N.Y. 2014) (citation, internal quotation marks, and alterations omitted).  Should the employer rebut this presumption, the plaintiff must prove that the employer's proffered reason "was not the true reason for the employment decision," and must establish facts "to support a rational finding that the legitimate reasons proffered by the defendant were false and that more likely than not retaliation was the real reason for the employment action." *Id.* (internal citation and quotation marks omitted); *see generally Zann Kwan* v. *Andalex Grp. LLC,* 737 F.3d 834, 845 (2d Cir. 2013).

Unlike retaliation claims brought under federal and state civil rights laws, a NYCHRL plaintiff need not show a material adverse action but instead can prove a retaliation claim by demonstrating that "[he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik,* 715 F.3d at 112.  Even under this "less demanding standard," a "plaintiff still must establish that there was a causal connection between [his] protected activity and the employer's subsequent action, and

must show that a defendant's legitimate reason for [his] termination was
pretextual or motivated at least in part by an impermissible motive." *Hughes* v.
*Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018)
(citation and internal quotation marks omitted).

### 2.   Analysis

#### a.   *Prima Facie* Case

As discussed above, to establish a *prima facie* claim of retaliation under
Title VII and the NYSHRL, a plaintiff must show: (i) he engaged in protected
activity; (ii) the defendant was aware of that activity; (iii) he suffered a
materially adverse action; and (iv) there was a causal connection between the
protected activity and that adverse action. *Kelly*, 716 F.3d at 14.  Plaintiff
contends that he was retaliated against (i) following his complaints about
"harassment" to Cooke, and (ii) in response to his request for a religious
accommodation.  (Pl. Opp. 20).  Defendants dispute that Plaintiff's emails to
Cooke constituted "complaints," and argue that in any event, Plaintiff has not
demonstrated a causal connection between his protected activities and any
adverse employment actions taken by Defendants.  (Def. Br. 21-22).

Beginning with the first prong, both parties agree that Plaintiff's request
for a religious accommodation was protected activity.  (Def. Br. 22; Pl.
Opp. 20).[27]  With respect to Plaintiff's emails to Cooke, in which he expressed

---

[27]     In passing, Plaintiff suggests that his "meetings with Nedderman and others to discuss
[his] religious accommodation request" constituted protected activity.  (Pl. Opp. 21).
The Court understands Plaintiff to refer to his conferences with Nedderman and other
supervisors to discuss his absences, in which his supervisors encouraged him to
submit his religious accommodation request to EEO.  (*See* Def. 56.1 ¶¶ 43, 55, 98).  The
Court agrees that these meetings may also "suffice to establish [Plaintiff's] participation

that he felt "a lot of hostility based on [his] beliefs from the administration" (*see* Blair Decl., Ex. R at 8 (Plaintiff October 10, 2018 email to Cooke)), the Court disagrees with Defendants that the emails did not constitute protected activity merely because Plaintiff did not formally "file" a complaint of discrimination. (*See* Def. Br. 21).

An employee's complaint may qualify as protected activity where (i) the employee "had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VI," and (ii) the employer "understood, or could reasonably have understood, that the [employee's] opposition was directed at conduct prohibited by Title VII." *Kelly*, 716 F.3d at 14-15 (citations omitted). And "informal complaints to management as to discrimination on a basis prohibited by Title VII" have been deemed protected activity. *Amin* v. *Akzo Nobel Chems., Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) (summary order) (citing *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). But such informal complaints "must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII." *Risco* v. *McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012); *see also Whitley* v. *Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016) ("A generalized complaint about perceived mistreatment without a specific connection to discrimination based on

---

in a protected activity and [Defendants'] knowledge of it." *Jeffrey* v. *Montefiore Med. Ctr.* No. 11 Civ. 6400 (RA), 2013 WL 5434635 at *23 (S.D.N.Y. Sept. 27, 2013) (deeming sufficient "plaintiff's repeated discussions with her supervisors … regarding her need for religious accommodation").

membership in a protected class is insufficient to establish a protected activity."). While it is a close call, given Plaintiff's assertion that he felt "hostility" based on his "beliefs," the Court finds that Plaintiff's emails to Cooke may be protected activity. *Compare St. Juste* v. *Metro Plus Health Plan*, 8 F. Supp. 3d 287, 323 (E.D.N.Y. 2014) (deeming not protected activity plaintiff's email to Human Resources requesting to meet "in regards to a meeting" he had with his supervisor, and indicating that it was "in reference to [his] religion"), *with id.* at 324 ("Here, Plaintiff's complaint that his supervisor was trying to make him choose between his job and his religion falls within the scope of conduct that is prohibited by Title VII.").

Defendants next argue that Plaintiff has not met the fourth prong of his *prima facie* case, as he "cannot show that 'but-for' his request for religious accommodation, he would not have been conferenced, marked LWOP, given two letters to file, or assigned to Court Services." (Def. Br. 22).[28] A causal connection in retaliation claims can be shown either "[i] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow

---

[28] While the Court found that much of this conduct was not adverse for the purposes of Plaintiff's disparate treatment claims, an "adverse employment action" in the retaliation context is broader than that for discrimination claims: "[T]he proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garett* v. *Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (alterations and internal quotation marks omitted). As Defendants' remaining arguments focus on the fourth prong of Plaintiff's *prima facie* case (*see* Def. Br. 21-22), the Court will accept that Plaintiff has established both adverse employment actions and Defendants' awareness of his protected activity for the purposes of this analysis.

employees who engaged in similar conduct; or [ii] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  Plaintiff argues that this requirement is met with evidence that he was only assigned to high-risk halls after making his request for an accommodation.  (Pl. Opp. 21).[29]  In the first instance, Plaintiff's supervisors disputed that there were any halls designated "high-risk."  (*See, e.g.*, Bobb. Dep. 37:4-37:7 ("All the halls are the same.  Anyone you work with could be a problem.  So there is no such thing as a worst hall."))  Moreover, while Jennings testified that Plaintiff was assigned to a high-risk hall after requesting a religious accommodation (Jennings Dep. 29:22-25), this testimony is both conclusory and undermined by the record before the Court, which reflects that Plaintiff was put on duty in the SHU upon his initial assignment to Crossroads and weeks before his first email exchange with Cooke (*see* Def. 56.1 ¶¶ 25-26, 36, 53-54, 63, 66 (reflecting that Plaintiff was assigned to the SHU on September 20-21, 2018, September 26-28, 2018, October 3, 2018, and October 5, 2018)).[30]  Plaintiff testified that residents in the SHU were "volatile,"

---

[29]    This argument is further undermined by Plaintiff's deposition testimony, in which he claimed that he was put with "the most volatile … kids" in reaction to his excessive absences.  (*See* Livingston Dep. 48:7-12 ("Q. Besides having the meetings, was there any other form of discipline that you received because you [were] missing … days of work?  A. I believe so.  I believe that I was put with the most volatile … kids that were willing to snap and spit on you and punch you.")).

[30]    In fact, Plaintiff was assigned to the SHU even before his first conference with Nedderman and other supervisors in late September 2018.  (*See* Def. 56.1 ¶¶ 25-26, 36 (reflecting Plaintiff's SHU assignments on September 20-21, 2018, and September 26, 2018); *see also id.* at ¶ 43 (discussing Plaintiff's first conference with Nedderman and other supervisors on September 26 or 27, 2018)).

and could "snap in a second."  (Livingston Dep. 41:9-16).  While the Court recognizes that Plaintiff may not have welcomed these assignments, it appears that they preceded both his request for accommodation and his complaints to EEO.

Plaintiff also argues that the "close temporal proximity" between his request for religious accommodation, his complaints to EEO, and the subsequent adverse actions he suffered, suffices to establish a causal connection.  (Pl. Opp. 21).[31]  Again, many of the "adverse employment actions" Plaintiff references — including conferences with his supervisors, being marked LWOP without being reimbursed, and being referred to discipline — predated most of his protected activity.[32]  And in support of his theory of "close temporal proximity," Plaintiff cites only to the timing of Barnes's October 16, 2018 conference with him and referral for discipline, which took place a week after he applied for a religious accommodation with EEO.  (Pl. Opp. 20 (citing Def. 56.1 ¶ 102)).  Nevertheless, while Barnes's discipline referral appears to have been precipitated by conduct that preceded Plaintiff's formal accommodation request to EEO (see Nedderman Dep. 33:10-25 (testifying that upon learning that Plaintiff had created his own work schedule, he asked Plaintiff's supervisor

---

[31]    Plaintiff contends that the discipline he received, which "eventually constructively discharge[d] his employment," constituted an adverse employment action.  (Pl. Opp. 21).  As discussed above, the Court does not find that Plaintiff experienced any constructive discharge, see supra note 17, but will consider the other purportedly adverse employment actions discussed in his briefing.

[32]    The Court notes that Plaintiff's conferences with his supervisors represent something of an exception, inasmuch as he appears to view these conferences as both protected activity and adverse employment actions for these purposes.

to conduct an investigation into Plaintiff's attendance record)), Plaintiff's reliance on temporal proximity may be sufficient to establish a *prima facie* case of retaliation.  *See Lovejoy-Wilson*, 263 F.3d at 224 ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (citation omitted)); *but see Stoddard* v. *Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) (summary order) ("[I]n the instant case, where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established.").

### b.   Non-Retaliatory Reason and Pretext

Even if Plaintiff has demonstrated a *prima facie* case of retaliation, the Court finds that Defendants have articulated a legitimate reason for their conduct.  As discussed above in connection with Plaintiff's discrimination claims, Defendants submit that they were following ACS's and Crossroads's policies in addressing Plaintiff's absences.  (*See* Def. Br. 16-17).  In fact, Nedderman's October 6, 2018 email to Crossroads staff states as much: "We should be conferencing, documenting, and following all time and leave procedures as it pertains to [Plaintiff]."  (Blair Decl., Ex. Q at 2).  And Plaintiff's supervisors attested to the importance of these policies for ensuring coverage and the safety of the juvenile residents in their care.  (*See, e.g.*, Bobb Dep. 36:2-5, 36:13-18; Barnes Dep. 50:20-51:4).

66

Since Defendants have articulated a non-retaliatory reason for the employment action, "the presumption of retaliation arising from [Plaintiff's] establishment of [his] *prima facie* case drops from the picture." *Zann Kwan*, 737 F.3d at 845. At this stage, Plaintiff must establish that retaliation was a "but-for" cause of Defendants' adverse actions, meaning "that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. Moreover, although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation ... without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed* v. *Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *accord Hawkins* v. *N.Y. State Off. of Mental Health*, 845 F. App'x 9, 11 (2d Cir. 2021) (summary order). Without the benefit of the presumption or temporal proximity, Plaintiff has failed to raise a triable issue that Defendants' non-retaliatory reason is "a mere pretext" for retaliation. *Zann Kwan*, 737 F.3d at 845 (citing *Univ. of Tex. Sw. Med. Ctr.* v *Nassar*, 570 U.S. 338, 348 (2013)).

Importantly, Plaintiff cannot establish that "but for" his requests for accommodation or his complaints to EEO, he would have continued to be conferenced, referred to discipline, and marked LWOP. Quite to the contrary, the record reflects an inverse relationship between Plaintiff's requests for accommodation and the complained-of conduct. Defendants repeatedly told Plaintiff to request an accommodation through EEO, and only threatened to continue conferencing him, referring him for discipline, and marking him

67

LWOP if he failed to pursue an accommodation and persisted in creating his own schedule.  (*See* Livingston Dep. 32:17-20 51:6-10, 99:12-14 (testifying that Nedderman instructed him to contact EEO to request his accommodation, and repeatedly scolded him for failing to turn in the "paperwork" for his accommodation); *see also* Blair Decl., Ex. Q at 1-2 (October 6, 2018 email from Nedderman to Crossroads officers indicating that they "should be conferencing, documenting, and following all time and leave procedures as it pertains to [Plaintiff]" because "EEO has not contacted [Crossroads] on [Plaintiff's] request")).

Plaintiff has failed to present evidence from which a jury could reasonably find that retaliation was the but-for cause of Defendants' putative adverse conduct.  Accordingly, the Court grants summary judgment as to Plaintiff's federal and state retaliation claims.  *See Mitchell* v. *State Univ. of N.Y. Upstate Med. Univ.*, 723 F. App'x 62, 64 (2d Cir. 2018) (summary order) (affirming magistrate judge's grant of summary judgment where "the record fails to show that the nonretaliatory reasons proffered by [defendant] for the various adverse actions were pretextual, let alone that retaliation was a but-for cause of the actions"); *see also Rodriguez-Coss* v. *Barr*, 776 F. App'x 717, 719 (2d Cir. 2019) (summary order) (affirming district court's judgment for similar reasons).

### c.    Plaintiff's NYCHRL Retaliation Claim

Plaintiff's retaliation claim fails even under the more lenient standard of the NYCHRL.  To sustain his NYCHRL claim, Plaintiff must establish that "[he]

took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik,* 715 F.3d at 112 (internal citations omitted). Importantly, Plaintiff must show a "causal link" between his protected activities and Defendants' allegedly retaliatory actions. *Gachette* v. *Metro N.-High Bridge*, 722 F. App'x 17, 21 (2d Cir. 2018) (summary order).

As discussed above, Plaintiff is unable to demonstrate any "causal link" between his requests for accommodation and complaints to EEO and Defendants' adverse conduct. The record demonstrates that Defendants emphatically encouraged Plaintiff to contact EEO, rather than deterring Plaintiff from engaging in protected activity in the form of requesting a religious accommodation. And indeed, following multiple conferences with his supervisors over a period of weeks, Plaintiff finally submitted his request for accommodation. (*See* Blair Decl., Ex. R at 1 (October 9, 2018 email from Plaintiff)). *See Mestecky* v. *N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (summary order) (affirming grant of summary judgment on NYCHRL claims where plaintiff failed to show that the "acts complained of [would] be reasonably likely to deter a person from engaging in protected activity" (citation omitted)).[33]

---

[33]   Plaintiff testified that he first reached out to EEO to discuss his request for a religious accommodation in early October 2018, but only after his conferences with Crossroads supervisors, again demonstrating that these conferences were effective in achieving their stated goals. (*See* Livingston Dep. 112:7-9).

Moreover, Plaintiff has not shown any causal nexus with respect to either Defendants' conduct that followed the submission of his request for accommodation, or their conduct that followed his emails to Cooke on October 10, 2018, and October 15, 2018.  For example, there is no indication that Barnes's October 16, 2018 conference with Plaintiff and resulting memoranda had any connection to Plaintiff's request for accommodation or emails to Cooke.  Rather, all evidence in the record indicates that both the conference and memoranda were consequences of Plaintiff's failure to timely submit his request for accommodation.  Accordingly, the Court grants summary judgment as to Plaintiff's NYCHRL claim as well.  *See Mazur* v. *N.Y.C. Dep't of Educ.*, 621 F. App'x 88, 90 (2d Cir. 2015) (summary order) (affirming dismissal of NYCHRL retaliation claim due to "a lack of the requisite causal link between [plaintiff's] complaints and any alleged retaliatory action," and where "the record contains numerous non-retaliatory reasons for any action taken against [plaintiff]"); *see also Kellman* v. *Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 390 (S.D.N.Y. 2014) ("Even after taking into account the NYCHRL's 'uniquely broad and remedial purposes,' no jury could find, based on the submitted evidence, that the issuance of the [critical letters of instruction], the investigation into the missing [activity report] and related Notice of Intent to Discipline, and the denial of training were caused even partly by retaliatory motives." (citation omitted)).

70

**E.**     **The Court Grants Summary Judgment as to Plaintiff's Hostile Work Environment Claims Against the City**

    **1.**     **Applicable Law**

The Court next addresses Plaintiff's hostile work environment claims.  To establish a hostile work environment under Title VII and the NYSHRL, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In order to prove the existence of a hostile work environment, a plaintiff must show both (i) that the alleged behavior was "severe or pervasive enough to create an objectively hostile or abusive work environment," and (ii) that the plaintiff "subjectively perceive[d] that environment to be abusive."  *Duch* v. *Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold* v. *New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *accord Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).

A work environment is "abusive" when harassment has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment."  *Raniola* v. *Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) (quoting *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 67 (1986)).  "On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for*

the worse.'" *Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 600 (2d Cir. 2006) (emphasis in original) (quoting *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).  In making this determination, the court, assessing the totality of the circumstances, examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cristofaro* v. *Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (quoting *Pucino* v. *Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)).

   "The incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Raspardo* v. *Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also Alfano*, 294 F.3d at 380 (concluding that proffered incidents of harassment "were too few, too separate in time, and too mild ... to create an abusive working environment"); *see generally Agosto* v. *N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020). While a single incident can suffice to substantiate a claim of hostile work environment, such an incident would have to be "extraordinarily severe." *Desardouin* v. *City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013). Furthermore, the plaintiff "must demonstrate that the conduct occurred because of" his protected status — here, Plaintiff's religion — and also that a "specific basis exists for imputing the conduct that created the hostile

environment to the employer." *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004).

Hostile work environment claims brought pursuant to the NYCHRL require a plaintiff to show only that he was subjected to "'unequal treatment' *based upon membership in a protected class*." *Fattoruso* v. *Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012) (emphasis in *Fattoruso*) (quoting *Williams*, 872 N.Y.S.2d at 40), *aff'd*, 525 F. App'x 26 (2d Cir. 2013) (summary order). "Even if the plaintiff establishes that [he] was treated 'less well' because of [his] [protected characteristic], defendants may assert 'an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.'" *Mihalik*, 715 F.3d at 111 (internal quotation marks omitted) (quoting *Williams*, 872 N.Y.S.2d at 41).

### 2.   Analysis

#### a.   Title VII and NYSHRL Hostile Work Environment Claims

Plaintiff asserts that he was subjected to a hostile work environment because he was: (i) humiliated and embarrassed when he was called into conferences; (ii) conferenced for being AWOL; (iii) subjected to "belittling comments and constant questioning and accusations that he was not Jewish; (iv) asked if he had "brain amnesia" when he attempted to leave early on a Friday; and (v) informed that he would be switched from his "permanent spot" and that "everyone could leave before him." (Pl. Opp. 24). Plaintiff further

73

contends that he feared for his safety, and that those fears were confirmed when he was "assaulted and spat on" by a resident who was later given a candy bar by Supervisor Carbone.  (*Id.*).

None of this is sufficient to establish a hostile work environment under Title VII and the NYSHRL.  All of this conduct — with the exception of "constant questioning and accusations that [Plaintiff] was not Jewish" — is the sort of facially neutral conduct that does not support a hostile work environment claim.  *See, e.g.*, *Harvin* v. *Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order) (holding that "[r]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace," and deeming insufficient allegations that supervisors were "rude and hostile on various occasions," including two occasions where they may have referred to plaintiff's disability); *Salerno* v. *Town of Bedford, NY*, No. 05 Civ. 7293 (SCR), 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."); *McGrath* v. *Thomas Reuters*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2119112, at *16 (S.D.N.Y. Apr. 30, 2012) (publicly humiliating plaintiff by tracking the number of times he left his desk to use the bathroom did not create a hostile work environment), *report and recommendation adopted*, 2012 WL 2122325 (S.D.N.Y. June 12, 2012).  While the Second Circuit has emphasized that "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is

relevant to a hostile work environment claim," *Rasmy* v. *Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020), as discussed in connection with Plaintiff's disparate treatment claims, the Court does not find that his supervisors engaged in any explicitly discriminatory conduct, *see Sandler* v. *Montefiore Health Sys., Inc.*, No. 16 Civ. 2258 (JPO), 2018 WL 4636835, at *10 (S.D.N.Y. Sept. 27, 2018) (finding comments relating to plaintiff's Jewish identity, even where "supplement[ed]" by "facially neutral harsh treatment," insufficient to sustain a federal or state hostile work environment claim).

With respect to Plaintiff's assertions that he was subjected to "belittling comments and constant questioning and accusations that he was not Jewish," he has only recounted one instance when he was told to "prove" that he was Jewish.[34]  As such, in assessing the "totality of the circumstances," the Court will consider only the specific comments identified by Plaintiff, rather than his sweeping assertions.  *See Kulak*, 88 F.3d at 71 ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (citations omitted)); *accord Hicks*, 593 F.3d at 166.  The comments recounted by Plaintiff include (i) being told to "prove" that he was

---

[34]    Lowery also testified that he overheard a "Sergeant Bob" comment, while Plaintiff was not present, that Plaintiff was "not really Jewish, did not have a religion, and just did not want to do [the] job."  (Lowery Dep. 15:8-14, 15:22-23, 54:15-24, 56:2-22). Although such "second-hand comments may be relevant" in analyzing a hostile work environment claim, *Whidbee* v. *Garzarelli Food Specialties*, 223 F.3d 62, 71 (2d Cir. 2000), in the absence of any other evidence in the record about Sergeant Bob's conduct towards Plaintiff, the Court does not find that this comment alone establishes a hostile work environment, *cf. Leibowitz* v. *N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) (recognizing that "remarks made outside a plaintiff's presence can be relevant to a hostile work environment claim," but holding nonetheless that plaintiff failed to prove a hostile work environment where she "was not herself a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing").

Jewish (Livingston Dep. 46:14-17); (ii) being asked if he had "brain amnesia" (*id.* at 49:24-50:11); and (iii) being told "maybe this job isn't for you" and that more senior staff would not "take it kindly" if he received Saturdays off (*id.* at 31:25-32:6, 36:7-17). These comments "may have created a tense and unpleasant atmosphere in which to work," but they were "not severe or pervasive enough to be actionable." *Kearse* v. *ATC Healthcare Servs.*, No. 12 Civ. 233 (NRB), 2014 WL 958738, at *8 (S.D.N.Y. Mar. 11, 2014) (finding plaintiff had not demonstrated a hostile work environment where he alleged, *inter alia*, that his supervisor repeatedly reprimanded him and "stated harsh things" about his work performance to other employees, limited his paid time off, and kept him past the time when he needed to leave); *see also Urban* v. *Cap. Fitness*, No. 08 Civ. 3858 (WDW), 2010 WL 4878987, at *9 (E.D.N.Y. Nov. 23, 2010) ("[A] 'hostile' work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment." (citation omitted)).[35]

For similar reasons, the Court is unpersuaded by Plaintiff's assertion that he was informed that he would be switched from his "permanent spot" and that "everyone could leave before him." (*See* Pl. Opp. 24 (citing Def. 56.1

---

[35]   Jennings testified as to one other comment made by Nedderman during roll call: "[W]orking here you won't have a life outside of work, you won't be able to see your children grow, whatever religious practices you have." (Jennings Dep. 26:8-17). Although this comment was not recounted by Plaintiff in his deposition, it is nonetheless relevant to the Court's assessment of his work environment. *See Whidbee*, 223 F.3d at 71. But on its face, this comment is neither clearly directed at Plaintiff nor disparaging of his religion. As with the other remarks discussed above, it lacks the requisite severity and pervasiveness to establish a hostile work environment. *See Kearse* v. *ATC Healthcare Servs.*, No. 12 Civ. 233 (NRB), 2014 WL 958738, at *8 (S.D.N.Y. Mar. 11, 2014).

¶ 118)).  The Court understands Plaintiff to refer to the same incident where he was asked by Supervisor Campbell if he had "brain amnesia" and told that "under no circumstance should [he] be ever able to leave before anybody else no matter what."  (Def. 56.1 ¶ 118).[36]  Given that Plaintiff had only attended work at Crossroads for approximately 13 days at this point, during which period his shift assignments varied, the Court is skeptical that he had any such "permanent" spot.  With respect to Plaintiff's assertion that he was told that "everyone could leave before him," based on his testimony about his interaction with Campbell, the Court understands that Plaintiff was merely told that he was not permitted to leave before his colleagues.  (Livingston Dep. 50:9-11).  The Court does not find this single encounter amounts to a hostile work environment, given that it was not "extraordinarily severe," and given the lack of any other allegations regarding Campbell's conduct towards Plaintiff. *Sandler*, 2018 WL 4636835, at *10 ("The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or … even to behave reasonably and justly when he is peeved." (citation omitted)); *cf. Alfano*, 294 F.3d at 374 ("[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted

---

[36]    While Plaintiff wrote to Cooke on October 15, 2018, that he had been told that he was to be "switch[ed] from his permanent spot where he [had] been eighty five percent of the time" to the "area that's well known to be the most chaotic and told that everyone can leave before me" (Def. 56.1 ¶ 94), he did not recount any such conversation in his deposition testimony.  Moreover, even had this exchange taken place as described in Plaintiff's October 15, 2018 email, it would not change the Court's assessment for the reasons discussed above.

to have altered the conditions of her working environment." (citation and quotation marks omitted)).

Lastly, the Court considers Plaintiff's contention that the purportedly hostile work environment at Crossroads made him fear for his safety.  The Court does not doubt that Plaintiff may have had valid safety concerns — indeed, both members of his training class who were deposed in connection with this litigation testified that they were injured while working at Crossroads. (Jennings Dep. 15:14-17; Lowery Dep. 9:12-14, 11:11-21).  Moreover, both Jennings and Lowery testified that they felt that the work environment at Crossroads was unsafe.  (Jennings Dep. 15:18-24; Lowery Dep. 47:5-12).  But the corroborating testimony of Plaintiff's co-workers merely demonstrates that working at Crossroads came with potential hazards.  The record does not indicate that these dangers bore any connection to Plaintiff's religion.  While Plaintiff testified that he *felt* physically threatened by Nedderman (Def. 56.1 ¶ 126), there is no indication that Plaintiff was in fact ever physically threatened by Nedderman or any of his other supervisors.  With respect to the incident involving an "out of control" resident who spat on and attempted to attack Plaintiff and another YDS, the Court does not find that this incident supports any finding of a discriminatory hostile work environment.  (*See id.* at ¶ 103).[37]

---

[37]     Plaintiff indicates that he later saw Supervisor Carbone give a candy bar to the resident, but himself gave conflicting testimony as to whether Carbone knew about his religious beliefs.  (Def. 56.1 ¶ 106).  He provided no other evidence indicating that Carbone bore him any discriminatory animus, instead testifying that while he did not "believe" that Carbone "was [one] of [his] direct supervisors" (Livingston Dep. 52:6-19), Carbone was one of four supervisors who informed him when his shift changed (*id.* at 106:21-107:5).

Accordingly, the Court finds that Plaintiff has not demonstrated any material issues of fact that would save his federal and state hostile work environment claims from summary judgment.

### b.   NYCHRL Hostile Work Environment Claim

Plaintiff's hostile work environment claim does not survive even under the NYCHRL.  As discussed above, Plaintiff must show that he was subjected to "'unequal treatment' based upon membership in a protected class." *Fattoruso*, 873 F. Supp. at 578 (emphasis omitted).  But for the reasons addressed at length in the Court's consideration of Plaintiff's disparate treatment claims, there is no triable issue of fact as to whether Defendants' behavior "was motivated by 'discriminatory animus.'" *Pena-Barrero*, 2017 WL 1194477, at *17 (citing *Askin* v. *Dep't of Educ. of City of New York*, 973 N.Y.S.2d 629, 630 (1st Dep't 2013)); *see also Dressler* v. *N.Y.C. Dep't of Educ.*, No. 10 Civ. 3769 (JPO), 2012 WL 1038600, at *14 (S.D.N.Y. Mar. 29, 2012) (granting summary judgment as to Plaintiff's NYCHRL hostile work environment claim "since [p]laintiff fails to adduce any evidence of discriminatory intent in the unpleasant conduct alleged"); *Ferraro* v. *N.Y.C. Dep't of Educ.*, 404 F. Supp. 3d 691, 720 (E.D.N.Y. 2017) (dismissing NYCHRL hostile work environment claim, finding that even if plaintiff's claims that, *inter alia*, defendants "threatened" him, issued "false" reports and observations, and gave him feedback in a

---

When directly asked whether there had been any other incidents involving Carbone, Plaintiff said only that the supervisors were "like a fraternity," and that he "felt a lot of animosity from all of them."  (*Id.* at 55:1-7).  Again, such conclusory assertions will not support a hostile work environment claim.  *See Kulak*, 88 F.3d at 71.

"critical fashion" were supported by the record, "there is no support in the record that [p]laintiff was treated worse than other teachers because of his disability"). Rather, Plaintiff was encouraged to seek out a religious accommodation, and was disciplined in accordance with ACS policies when he failed to do so and failed to abide by ACS's attendance procedures.

Moreover, even had Plaintiff put forth evidence of discriminatory animus, his non-conclusory assertions regarding Defendants' conduct amounts at most to "petty slights" and "trivial inconveniences." *See, e.g., Colon* v. *Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 292 (S.D.N.Y. 2013) (finding that while plaintiff's boss may have been "overbearing or obnoxious," those actions did "not rise above the level of 'petty slights and trivial inconveniences'" (quoting *Mihalik*, 715 F.3d at 110-11)); *Rozenfeld* v. *Dep't of Design & Constr. of N.Y.C.*, 875 F. Supp. 2d 189, 209 (E.D.N.Y. 2012) (acknowledging "the lack of tact and inappropriateness of calling Plaintiff part of a 'mental retard case,'" but finding that Plaintiff alleged "nothing more than, at most, petty slights or trivial inconveniences" in support of his NYCHRL hostile work environment claim (citation omitted)), *aff'd*, 522 F. App'x 46 (2d Cir. 2013) (summary order). The Court thus grants summary judgment in full as to Plaintiff's hostile work environment claims.

## F. The Court Grants Summary Judgment as to Plaintiff's Claims Against Nedderman

### 1. Applicable Law

Plaintiff also brings claims against Nedderman alone under the NYSHRL and the NYCHRL, including claims that Nedderman aided and abetted

retaliatory actions against Plaintiff and intentionally created a hostile work environment because of Plaintiff's religious beliefs.  While Title VII does not provide for individual liability, *see Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998), individuals can be liable under both the NYSHRL and the NYCHRL.  Under the NYSHRL, an individual can be liable where the defendant (i) is considered an "employer," N.Y. Exec. Law § 296(1), or (ii) aided and abetted the unlawful discriminatory acts of others, *id.* § 296(6).  *See Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015).  An individual defendant may be liable as an "employer" under the NYSHRL "when that individual has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others," *i.e.*, the power to hire or fire.  *Townsend* v. *Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (internal quotation marks omitted).

With respect to the aiding and abetting theory of individual liability, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYSHRL], or to attempt to do so."  N.Y. Exec. Law § 296(6).  The Second Circuit has held that "this language allow[s] a co-worker who actually participates in the conduct giving rise to a discrimination claim to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  *Feingold* v. *New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citation and internal quotation marks omitted).  "This extends to personal liability 'for aiding and abetting allegedly unlawful

81

discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." *Xiang* v. *Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (quoting *Conklin* v. *Cnty. of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012)); *accord Ulrich* v. *Soft Drink, Brewery Workers & Delivery Emps.*, No. 17 Civ. 4730 (KMK), 2019 WL 6498089, at *6 n.10 (S.D.N.Y. Dec. 3, 2019).

"The NYCHRL provides a broader basis for direct individual liability than the NYSHRL," in that it provides for individual liability of an employee "regardless of ownership or decisionmaking power." *Malena* v. *Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. Aug. 16, 2012) (citation omitted). As the "pertinent language of the two laws is 'virtually identical'" with respect to aiding and abetting liability, "applying the same standard under the NYSHRL and the NYCHRL is appropriate." *Lyman* v. *N.Y. & Presbyterian Hosp.*, No. 11 Civ. 3889 (KPF), 2014 WL 3417394, at *20 (S.D.N.Y. July 14, 2014) (quoting *Meyer* v. *N.Y. Off. of Mental Health*, No. 12 Civ. 6202 (PKC), 2014 WL 1767818, at *7 (E.D.N.Y. May 2, 2014)).

### 2.   Analysis

Plaintiff's claims against Nedderman fail under either supervisory or aiding and abetting theories of liability. Plaintiff first argues that Nedderman should be found liable because he "made indirect comments about Plaintiff's religion, and marked him LWOP even though he and others knew why he was

not present at work on Saturdays due to the Sabbath and other Jewish

holidays." (Pl. Opp. 27).

    As discussed above, an individual defendant may be liable as an

"employer" under the NYSHRL "when that individual has an ownership interest

in the relevant organization or the power to do more than carry out personnel

decisions made by others." *Townsend*, 679 F.3d at 57.  And under the

NYCHRL, a supervisor or other employee may be held individually liable

regardless of whether he or she was an owner or had the authority to make

personnel decisions.  *Villar* v. *City of New York*, 135 F. Supp. 3d 105, 143

(S.D.N.Y. 2015).  Assuming Nedderman could be held liable under these

standards, for the same reasons discussed in connection with Plaintiff's

discrimination and hostile work environment claims, Plaintiff has failed to

establish Nedderman's liability as either an employer or supervisor.  *First*,

neither of the two comments attributed to Nedderman demonstrates any

discriminatory animus.  (*See* Livingston Dep. 46:14-17 (testifying that Plaintiff

was asked to "prove" that he was Jewish); Jennings Dep. 26:10-17 (testifying

that Nedderman said in a roll call, "[W]orking here you won't have a life outside

of work, you won't be able to see your children grow, whatever religious

practices you have.")).  As with Nedderman's other comments inquiring about

the status of Plaintiff's "paperwork" (Livingston Dep. 51:6-10), these comments

reflect, at most, Nedderman's frustration with Plaintiff's delays in requesting an

accommodation from EEO and with Plaintiff's disregard of ACS's absence

procedures.  *Second*, Nedderman's directive to Plaintiff's supervisors to "follow

all time and leave procedures as it pertain[ed] to [Plaintiff]" (Blair Decl., Ex. Q at 1-2 (October 6, 2018 email from Nedderman to Crossroads officers)), which included marking him LWOP, merely indicates that — after instructing Plaintiff on a number of occasions to submit his request for an accommodation — Nedderman did not intend to continue making an exception for Plaintiff until Plaintiff took the initiative to submit his request to EEO.

The Court next turns to Plaintiff's aiding and abetting theory of liability.[38] Given the Court's findings that Plaintiff has not established a claim for discrimination, hostile work environment, or retaliation against the City, it cannot find that Nedderman participated in or aided and abetted any such conduct for the purposes of the NYCHRL and NYSHRL.  *See Jain* v. *McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011) ("[T]he NYSHRL and NYCHRL require 'that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.'" (quoting *DeWitt* v. *Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999)); *see also McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d

---

[38]   In his opposition, Plaintiff mischaracterizes his "aiding and abetting claim" as an alternative theory by which he seeks to hold all Defendants liable, although the claim was in fact brought only against Nedderman.  (*See* Pl. Opp. 26; *see also* Dkt. #1 at ¶¶ 147-49)).  In any event, to the extent Plaintiff seeks to hold the City liable on an aiding and abetting theory of liability, those claims do not survive summary judgment.  *See Tulino* v. *City of New York*, No. 15 Civ. 7106 (JMF), 2016 WL 2967847, at *5 (S.D.N.Y. May 19, 2016) (noting that where a plaintiff's NYSHRL discrimination and hostile work environment claims were dismissed "it [was] unclear what unlawful conduct the [defendants] aided and abetted"); *see also Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021) ("Since a defendant cannot aid and abet its own violation of the NYSHRL and NYCHRL, the hostile work environment claim against Montefiore cannot serve as a predicate for the aiding and abetting claim against Montefiore.").

51, 68 n.7 (S.D.N.Y. 2020) ("A plaintiff claiming aiding and abetting must, however, adequately allege that the employer engaged in discrimination or retaliation under the standards of the NYSHRL and NYCHRL."); *Xiang*, 2020 WL 248941, at *5 (observing that an individual can be personally liable "for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability, *so long as the employer's conduct has also been found to be discriminatory under the NYSHRL*" (emphasis added) (citation and quotation marks omitted)).[39]

The Court thus grants summary judgment as to Plaintiff's claims against Nedderman.

## G.     The Court Grants Summary Judgment as to Plaintiff's Negligent Hiring, Retention, and Supervising Claim Against the City

Lastly, the Court addresses Plaintiff's claim against the City for negligent hiring, retention, and supervision.  The Second Circuit has observed that:

> To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: [i] that the tort-feasor and the defendant were in an employee-employer relationship; [ii] that the employer "knew or should have known of the employee's propensity for the

---

[39]    In *Springs* v. *City of New York*, the district court permitted the plaintiff to proceed with his NYCHRL aiding and abetting claim against individual defendants, even where that plaintiff had failed to establish a primary violation by his employer, upon concluding that "employer liability is essential to establishing *any* predicate discrimination violation in the NYSHRL context, but not under NYCHRL."  No. 17 Civ. 451 (AJN), 2019 WL 1429567, at *16 (S.D.N.Y. Mar. 29, 2019) (emphasis in *Springs*).  The district court reasoned that defendants had not identified any cases "address[ing] why a finding of co-worker liability for an underlying NYCHRL discrimination claim is an insufficient predicate for an aiding and abetting discrimination claim, nor is there anything in the statutory language that compels such a limitation."  *Id.*  The Court need not address the questions raised by *Springs*, as Plaintiff has not established any predicate violation by Nedderman's employer or co-workers.

conduct which caused the injury" prior to the injury's occurrence; and [iii] that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens* v. *Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations omitted). Based on this standard, this Court has previously found that granting summary judgment on an "underlying tort," "vitiates Plaintiff's ability to bring [a] derivative claim [of negligent hiring or retention]." *Zeak* v. *United States*, No. 11 Civ. 4253 (KPF), 2015 WL 246340, at *3 (S.D.N.Y. Jan. 20, 2015). It reaches the same conclusion here. "Lacking a predicate tort," Plaintiff cannot proceed with his derivative claim of negligent hiring, retention, and supervision. *See id.* (collecting cases); *see also Pinto* v. *City of New York*, No. 15 Civ. 9696 (CM), 2017 WL 5508917, at *6 (S.D.N.Y. Mar. 2, 2017) (dismissing negligent hiring, screening, supervising, and training claim, and reasoning, "[s]ince all of Plaintiff's underlying claims have been dismissed, she cannot sustain this type of derivative claim"), *aff'd,* 728 F. App'x 26 (2d Cir. 2018) (summary order); *Moore* v. *United States*, No. 18 Civ. 3679 (KMK), 2020 WL 2765833, at *7 (S.D.N.Y. May 27, 2020) (dismissing negligent hiring, supervising, or training claim where plaintiff failed to establish an underlying tort).[40] The Court thus grants summary judgment as to Plaintiff's negligent hiring, training, and supervision claim.

---

[40]   Moreover, "[t]o maintain a claim against a municipal employer for the 'negligent hiring, training, and retention' of a tortfeasor under New York law, a plaintiff must show that the employee acted 'outside the scope of her employment.'" *Velez* v. *City of New York*, 730 F.3d 128, 136-37 (2d Cir. 2013) (citation omitted); *see also Sullivan* v. *City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("Under New York law, a failure-to-train claim generally cannot survive where the alleged injuries are caused by an employee acting within the scope of her employment.") (collecting cases). Here, Plaintiff has not established, let alone made any argument,

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety.  The Clerk of Court is directed to terminate all motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      September 28, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

that the complained-of conduct occurred outside the scope of his supervisors' employment.  Thus, even had any of Plaintiff's predicate claims survived the motion for summary judgment, his negligent hiring, training, and supervision claim would nonetheless fail.

87